**COMPAGNIE DE REASSURANCE D'ILE DE FRANCE, et al., Plaintiffs, Appellants,**

v.

**NEW ENGLAND REINSURANCE CORPORATION, et al., Defendants, Appellees.**

**COMPAGNIE DE REASSURANCE D'ILE DE FRANCE, et al., Plaintiffs, Appellees,**

v.

**NEW ENGLAND REINSURANCE CORPORATION, et al., Defendants, Appellants.**

Nos. 93–2338, 93–2339.

United States Court of Appeals, First Circuit.

Heard May 5, 1994.

Decided June 19, 1995.

As Amended on Denial of Rehearing July 12, 1995.

---

Robert S. Frank, Jr., with whom Cynthia T. MacLean, David A. Attisani, Choate, Hall & Stewart, David S. Mortensen and Tedeschi, Grasso & Mortensen, Boston, MA, were on brief for defendants.

Allan B. Taylor, with whom William Shields, Kenneth W. Ritt, Boston, MA, Matthew E. Winter, Stamford, CT, Mary Theresa Kaloupek and Day, Berry & Howard, Boston, MA, were on brief for plaintiffs.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and CARTER, District Judge.*

* Of the District of Maine, sitting by designation.

LEVIN H. CAMPBELL, Senior Circuit Judge.

This is an appeal from a final judgment of the district court in an action brought by a number of foreign reinsurance syndicates, companies and pools against a domestic reinsurance company and related parties. At issue are reinsurance contracts (or "treaties," as they are known) under which plaintiffs, Compagnie De Reassurance D'Ile de France, et al.,[1] agreed to reinsure portions of risks selected, and also reinsured, by defendant New England Reinsurance Corp. ("NERCO"). After sustaining heavy losses under these Treaties, plaintiffs sued defendants NERCO, First State Insurance Company ("First State"), and Cameron and Colby Co., Inc. ("Cameron & Colby"), alleging that they had been induced to enter into the reinsurance treaties by fraud, and further claiming breach of contract, violations of Mass.Gen.L. ch. 93A, § 2, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants counterclaimed, alleging breach of contract and violations of Mass.Gen.L. ch. 93A, § 2. Following a 30–day bench trial, the district court found for the plaintiffs on all but the RICO claims. The court ordered rescission of the challenged reinsurance Treaties and ordered defendants to pay plaintiffs $38,118,940.07, representing all sums plaintiffs had previously paid out on losses incurred under the Treaties with credit for premiums received, plus prejudgment interest at 12 percent. Defendants estimate that the net cost to them of the court's decision, adding together the court's judgment and the sums plaintiffs have been excused from paying out as reinsurers of various losses, is approximately $106 million.

Defendants have appealed from the judgments for plaintiffs on the fraud, contract and Mass.Gen.L. ch. 93A claims. Plaintiffs have cross-appealed from the district court's dismissal of their RICO claim. For the reasons set forth below, we sustain the district court's findings and rulings on certain matters; reverse others as being clearly erroneous or legally incorrect; and identify still others that require the district court to make findings and rulings now absent. We, therefore, vacate the district court's judgments and remand for further proceedings consistent herewith. Our specific dispositions are summarized on pages 93–94 of this opinion.

## I. Background

The following is an overview. More specific facts will be related as needed in our discussion of the various issues.

The defendants are all subsidiaries of the Hartford Group of Insurance Companies ("the Hartford").[2] First State, based in Boston, Massachusetts, was a primary insurer. NERCO was a Boston-based reinsurer. Cameron & Colby, also based in Boston, provided management, marketing, underwriting, and other services to both First State and NERCO. Neither First State nor NERCO had employees of its own; their businesses were carried on by employees of Cameron & Colby. Graham Watson, Inc.,[3] not a party, was created in 1979 as an unincorporated division of Cameron & Colby; it became the latter's wholly owned subsidiary in mid–1980. Graham Watson's role was to provide marketing and underwriting services

---

1. The plaintiffs are listed in the district court's opinion. *See Compagnie de Reassurance D'Ile de France v. New England Reinsurance Corp.*, 825 F.Supp. 370, 373 n. 2 (D.Mass.1993). Plaintiffs Pohjola Insurance Company Ltd. and Pohjola Insurance Company (UK) Limited were dismissed on motion of the defendants, with the consent of the plaintiffs during the trial, and the parties entered a Stipulation of Dismissal dated May 5, 1995, whereby plaintiff De Centrale Herzverzekering N.V. dismissed its appeal in No. 93–2338, and the defendants dismissed their appeal in No. 93–2339 against De Centrale only, leaving 31 plaintiffs remaining.

2. The relationship between these defendants and their corporate parents, the Hartford and ITT, is described in the district court's opinion, 825 F.Supp. at 373. Neither the Hartford nor ITT is a party to this case.

3. This entity is variously referred to as "Graham–Watson" and "Graham Watson" in the documents contained in the record. Like the district court, we will use the unhyphenated form, unless quoting directly a source using the hyphenated form.

in the facultative[4] reinsurance venture that is the subject of this litigation.

The underlying casualty and property risks germane to this case were located in North America. Individuals and entities wishing to insure against these risks procured policies of insurance from primary insurers. The latter then purchased reinsurance from NERCO in order to indemnify themselves in whole or in part against losses sustained under the primary policies they had issued.

Not wanting to keep all the exposure that it had assumed as a reinsurer, NERCO itself—often acting with and through Graham Watson—sought reinsurance on the London insurance market, resulting in the arrangements with which this lawsuit is concerned. Under these reinsuring agreements—the so-called System and Non-System ("SANS") Treaties—many syndicates at Lloyd's of London and other overseas reinsurance entities (some of whom are the plaintiffs in this case) agreed to provide continuing reinsurance to NERCO on a portion of each risk it reinsured. In industry terminology, NERCO, having been "ceded" the risks by the primary insurers, became a "retrocedent," the plaintiffs became "retrocessionaires," and the agreements between them were "retrocessional" treaties. The plaintiff retrocessionaires agreed to indemnify NERCO for a portion of any losses NERCO might sustain in its reinsurance of primary insurers. In return, NERCO promised to acquire ("produce"), evaluate ("underwrite"), and price ("rate") the risks and to share with plaintiff retrocessionaires, subject to its retention of certain commissions, a portion of the premium it received.

### A. Signing the Treaties

In 1979, NERCO retained a U.S. broker, G.L. Hodson, to assist it in arranging for this reinsurance on the London market. Towards this end, Graves Hewitt, the CEO of Cameron & Colby, and his associates drafted and circulated in late 1979 a document known as the Placing Information. This document stated that Cameron & Colby had established the Graham Watson division after studying facultative reinsurance operations in North America and after receiving the approval and support of the Hartford and ITT.[5] The stated purpose of the division was:

1. To participate in the property and casualty facultative reinsurance business which is currently dominated by the direct writers.

2. To rationalise [sic] the facultative placements of both the Hartford and the First State not only from an administration [sic] point of view but also to provide the retrocessionaires with a broad cross section of facultative reinsurance emanating from these two companies.

According to the Placing Information, Graham Watson was charged with penetrating the "non-brokered ... direct professional reinsurance market," leaving "[f]acultative reinsurance emanating from reinsurance intermediaries ... [to] continue to be written separately through NERFAC," the latter being an existing in-house entity that had, for some time, been writing reinsurance for the defendants. The Placing Information was circulated to, among others, several European sub-brokers retained by Hodson to act on NERCO's behalf in seeking potential retrocessionaires.[6]

---

4. Facultative reinsurance is one of the two major types of reinsurance, the other being treaty reinsurance. From the Latin word for "ability" or "power," "facultative," broadly speaking, connotes the option to reinsure, or not, each particular risk, as contrasted with a binding arrangement to reinsure all risks of a particular sort. *See infra.* A major issue in this case is whether the reinsurance provided by defendants was "facultative," as promised in the SANS Treaties.

5. Plaintiffs' fraud claims rely significantly on representations made in the Placing Information, especially those pertaining to Graham Watson's

intention to procure non-brokered, "direct" business from "selected primary companies" rather than brokers. We attach as an appendix a copy of the Placing Information typically circulated to the plaintiffs.

6. These included Sedgwick Payne, North American Reinsurance Brokers Ltd.; Anglo–Swiss Reinsurance Brokers, Ltd.; Carter Brito E Cunha Ltd.; Fielding & Partners; and Jardine Thompson Graham Ltd. None of the sub-brokers are parties to this suit.

In late 1979, Hewitt traveled to London accompanied by Thomas Hearn, a Hodson employee. Aided by employees of sub-broker Sedgwick Payne, they approached Ralph Bailey, the head underwriter for plaintiff Terra Nova Insurance Company Limited, and described to him the proposed reinsurance plan. Sedgwick–Payne's brokers thereafter negotiated with Bailey the "slips" spelling out the terms of the treaties. With Bailey agreeing to act as "lead underwriter" for the London market companies, the brokers approached Ron Kellet, head underwriter for plaintiff B.P.D. Kellet & Others, a Lloyd's syndicate, with the request that he act as lead underwriter on behalf of all other Lloyd's syndicates.[7] After the leads had stamped and initialed the slips, indicating the proportion of the total risk they were bound to accept, the slips were separately presented for approval to the underwriters for each of the plaintiffs,[8] each of whom indicated his or her acceptance of a portion of the risks by initialing the slip.[9]

These slips constituted, in abbreviated form, the contracts between the cedent NERCO and the various retrocessionaires.[10] Briefly summarized, the slips provided that the subject matter of the Treaties was "Business classified by the Reassured [NERCO] as Property and Casualty Facultative Assumed business produced and underwritten by the Graham Watson division of Cameron & Colby Co., Inc." They also stated that the Lead Underwriter had authority to require exclusion of certain types of risks, and to agree to the final wording of the formal contract. NERCO was to retain a minimum of $250,000 of each risk ceded, and as respects system business (i.e., risks written by First State and other Hartford entities, *infra*), was not to cede more than 50 percent of the original reinsurance limit of any given risk to the Treaties, and was to co-reinsure for 10 percent participation on each such risk. The slips also specified the commission structure and various other conditions of the Treaties. The slips did not incorporate the Placing Information as such.

Each underwriter subsequently signed Treaty Wordings, formal contracts containing a more elaborate statement of the parties' agreements. These were based on the slips, and the parties agreed that, in the event of any inconsistency, the slips would control. The first set of SANS Treaties ran for the eleven month period from February 1 through December 31, 1980. Thereafter, those plaintiffs who desired to continue for another year indicated their willingness to join by initialling new slips and ultimately executing new Treaty Wordings for 1981. Successive Treaties were entered into for 1982 and for 1983. Some of the plaintiffs entered into Treaties for each of the four years; others were parties to the Treaties for only one, two, or three of those years. The Treaties were open to renegotiation each

---

7. A lead underwriter is initially responsible for negotiating the terms of reinsurance contracts such as the SANS Treaties. The lead underwriter normally commits his or her firm or syndicate to a level of participation in a treaty that is somewhat higher than that of other participating reinsurers, who are referred to as the "following market." Members of the following market rely on the underwriting skill and judgment of the lead as an important factor when deciding whether and by how much to commit themselves on reinsurance obligations. Thus, having a reputable underwriter as lead can have a significant effect on the ability to fully place a retrocessional treaty. There were actually two lead underwriters in this case: Bailey for the London market companies and Kellet for the Lloyd's syndicates. *See Edinburgh Assur. Co. v. R.L. Burns Corp.*, 479 F.Supp. 138, 145 n. 2 (C.D.Cal.1979) ("The market sometimes recognizes both a lead underwriter at Lloyd's and a lead company underwriter."), *aff'd in relevant part*, 669 F.2d 1259 (9th Cir. 1982).

8. Not all of the 31 plaintiffs participated in all four years of the SANS Treaties. (28 of the plaintiffs participated in the 1980 SANS Treaties; 29 participated in 1981; 27 participated in 1982; and 15 participated in 1983.) However, the process of stamping and initialling the slips to indicate acceptance of a portion of the risk was repeated in each of the following three years (1981–83) with respect to each individual plaintiff. We also note that the plaintiffs were not the only retrocessionaires participating in the SANS Treaties; in all, approximately 100 separate entities accepted portions of these risks over the four years in question.

9. For a detailed discussion of the business practices of the London insurance market, *see Edinburgh Assur.*, 479 F.Supp. at 144–46.

10. We place in the appendix portions of one of the typical slips utilized here.

year, and certain changes, e.g., relating to commission structure and the like, were in fact made.

For each Treaty year there were actually two slips prepared, one for property business and one for casualty business. The business covered by each slip was further divided into "system business" and "non-system business." "System business" denoted risks written by member companies of the Hartford, and included, among others, First State and the Hartford itself. "Non-system business" referred to risks written by any other primary insurer. As a condition of participation, although not included in the written contracts, Bailey insisted that no non-system business be ceded to the SANS Treaties for the first year. He testified in his deposition that this was because he felt that the system business was "the steadier, better part of the portfolio."

## B. Performance of the Treaties

Once the Treaties were fully placed for the 1980 treaty year, NERCO began retroceding to the plaintiffs portions of the risks it was reinsuring. Central to the plaintiffs' present complaint, and to the district court's finding of liability, are the source and nature of NERCO's business as ceded to them. In the first year, over 95 percent of the business so ceded was system business. However, few, if any, of the risks reinsured were from Hartford companies other than First State. In the ensuing three years, the proportion of system business declined in favor of non-system business to less than 50 percent. There was evidence that defendants had hoped that system business would grow and that NERCO and its retrocessionaires would obtain more reinsurance business directly from the other Hartford companies, in addition to First State, but that these hopes were not realized.

The proportion of non-system business rose steadily after the first year, but the non-system business was of a kind which plaintiffs contend, and the district court found, was different from that represented in the Placing Information. The court construed the Placing Information as representing "that Graham Watson would produce 'non-system' reinsurance business directly from primary insurance companies without the use of intermediaries." In support of the court's construction, plaintiffs point to representations in the Placing Information that Graham Watson did not intend to seek reinsurance "on a wholesale basis from all and sundry" but rather to develop a close working relationship "with selected primary companies." The Placing Information stated that non-brokered business "placed significantly with the direct professional reinsurance market" characterized over 80 percent of United States facultative reinsurance. The Placing Information also stated that Graham Watson was "charged with the responsibility of penetrating this business." Notwithstanding these announced intentions in the Placing Information, most of defendants' growing non-system business after the end of 1980 was, in fact, obtained from intermediaries— to wit, brokers and Managing General Agents ("MGAs"). MGAs serve as agents of primary insurance carriers with authority to underwrite and place certain business on the insurers' behalf. Defendants received the majority of their non-system business, portions of which were then ceded to the plaintiffs under the SANS Treaties, from Baccala & Shoop Insurance Services, an MGA representing a variety of primary insurance companies. Baccala & Shoop worked closely with the broker, G.L. Hodson; in fact, they were owned by the same entity.

### 1. Semi–Automatic and Automatic Facilities

Another key issue in the present litigation stems from the fact that, during the annual periods covered by the Treaties, almost all of the non-system business that defendants produced, and shared with the plaintiffs, was underwritten using what are called "semi-automatic facilities." (A "facility" is an agreement setting out, among other things, the rules under which a reinsurer will reinsure risks ceded by the other party.) Defendants insist that semi-automatic facilities were perfectly consistent with the representations in the slips and Treaties that the reinsurance to be ceded to plaintiffs would be "business classified by the Reassured [NER-

CO] as Property and Casualty *Facultative* Assumed business." (Emphasis supplied.) Plaintiffs sharply dispute this. Calling facultative underwriting the "fundamental material term in the SANS Treaties," the district court agreed with plaintiffs that the term "facultative" included only reinsurance that a reinsurer underwrites and negotiates with the primary insurer on a risk-by-risk individual certificate basis in advance, i.e., a certificate of reinsurance is issued for each risk after the reinsurer has first looked into and approved reinsuring that particular risk.

Under the semi-automatic method that defendants mostly used in underwriting non-system risks, defendants' underwriters did not evaluate risks one at a time in advance of the issuance of a policy of reinsurance on each risk. Instead, in contracts called "Master Facultative Certificates" ("MFCs"), NERCO agreed with an MGA, broker, or primary insurer that the latter entity could issue reinsurance upon risks of described types, and upon certain conditions and with certain limits, prior to defendants' underwriters' scrutiny and approval of the risk. *After* the reinsurance attached to each risk, however, the agent or ceding company would send to Graham Watson a "risk bordereau"—a document identifying and providing a summary of information as to that, and any other, risks reinsured within the reporting period. Graham Watson then had a brief period after receipt of the bordereau, for example 72 hours, within which to cancel the reinsurance on a particular risk if it so desired, cancellation to take effect within a specified period, say, 14 days.

Defendants contend, and presented evidence at trial, that the semi-automatic facility is commonly classified in the industry today as a form of facultative reinsurance. They concede that, in an earlier era, "facultative" was a term applied only to reinsurance individually underwritten on a risk-by-risk basis

in advance of binding. But while accepting that the reinsurer's right to reject individual risks remains a general feature of facultative reinsurance, defendants contend that this feature is adequately preserved in the more economical and streamlined semi-automatic facility.[11]

Defendants also used, in a few instances, a variation known as an "automatic facility." Under this type of facility, rather than having the right to cancel an individual risk, the reinsurer has the right to cancel the entire facility on very short notice. Even without the right to cancel a particular risk, defendants argue that this was "facultative," since the reinsured would, as a practical matter, agree to cancel individual risks rather than face cancellation of the entire facility. Moreover, the reinsured retained the freedom to cede or not to cede a particular risk, which is not the case in treaty reinsurance. Automatics comprised only a small portion of the non-system business, most of which was underwritten using semi-automatics.

## 2. The First State Business

With regard to system business (which was almost exclusively with First State), the defendants did not use a risk bordereau, nor did they ever enter into a formal contractual arrangement spelling out First State's and NERCO's relationship in respect to the latter's reinsuring of risks later assigned under the SANS Treaties. There was evidence, however, indicating how matters worked in practice. In practice, First State's underwriters had the power initially to commit NERCO and the SANS Treaty signatories to the reinsuring of individual risks primarily insured by First State. The reinsurance was evidenced by a layoff sheet that First State prepared; each layoff sheet identified a First State risk that NERCO and the Treaty signatories were to reinsure, and provided a brief summary of information about that risk.

11. Because of the cedent's right of cancellation, and the reinsured's right not to cede, defendants and their experts contend that the semi-automatic facility is a form of facultative reinsurance, and is not forbidden "treaty" reinsurance. The SANS Treaties contained an express exclusion for "assumed treaty" business. In "treaty" reinsurance, the reinsurance arises solely as the consequence of the terms of a prior general contract, with no right on the reinsurer's part to reject a particular risk that meets the terms of the contract, and without any right on the reinsured's part to decline to cede a particular risk, always assuming that the risk in question conforms to the terms of the prior contract.

A packet containing many of these layoff sheets was periodically provided by First State to Graham Watson, whose underwriter could study the risks and would have the right to cancel the reinsurance at will.

Defendants contend that this method was "facultative" because each risk was individually evaluated in due course by a Graham Watson underwriter based on the information provided on the layoff sheets—and by follow-up phone and face-to-face inquiries, as well as by means of microfiches which reproduced First State's entire underwriting file for a risk, and were available upon request— and it was understood that the reinsurance was subject to cancellation at will by Graham Watson. They point out that because First State's and Graham Watson's employees were under the same roof and answerable to the same bosses, the latter's underwriters could informally influence First State not to cede business the latter did not wish, as further evidence of their facultative control. Notwithstanding the absence of a written understanding between Graham Watson and First State, the district court found, after hearing the evidence, that, "Graham Watson underwrote all 'system business' ... by the 'automatic' and/or 'semi-automatic' method of underwriting." Since practically all system business was with First State, this finding grouped that underwriting with the explicit semi-automatic and automatic facilities used in non-system business.

### 3. Further Performance

At trial, plaintiffs made much of the absence of proof of particular occasions when defendants had ever actually rejected a risk listed in a bordereau or layoff sheet. Plaintiffs also sharply questioned whether the information in the bordereaux and layoff sheets was sufficient to allow for adequate underwriting (evaluation) of individual risks. Defendants responded by emphasizing that, whether or not used, the right to reject at all times existed, and by pointing to evidence

that its underwriters adequately reviewed the risks and had other means—personal inquiries, telephone calls, inspection of First State files, and so on—to make inquiry in doubtful cases. Defendants' evidence also indicated that Graham Watson conducted periodic audits of the underwriting practices of MGAs and others in order to assess compliance with the terms of the various facilities. The district court found no evidence that defendants had rejected any risks and found that Graham Watson's underwriting of individual risks was inadequate.

In any case, while defendants wrote some small percentage of reinsurance under the SANS Treaties that was facultative in the traditional sense of advance risk-by-risk underwriting, most of the reinsurance produced under the SANS Treaties was underwritten either under some variety of the semi-automatic facility or, in the case of First State system business, under the informal in-house procedures previously described. And, as mentioned above, over the four years of the SANS Treaties, one MGA, Baccala & Shoop, furnished almost all of the non-system business to defendants. Non-system business was found by the court to constitute approximately one-half of the treaty business during the four year period.

The agreement with Ralph Bailey to avoid non-system business for the first year was not to the liking of Graham Watson, whose employees felt that non-system business would be a steadier source of income for the Treaties. Bailey also made known his dislike of MGAs and his reluctance to allow MGA business to be ceded to the SANS Treaties. Bailey testified that, because MGAs did not themselves bear any risk, they did not underwrite as carefully as did underwriters on the payrolls of the primary companies, and hence the business produced through them was of a lower quality.[12] Again, this was not to the liking of Graham Watson; one internal memorandum, dated December 11, 1980, stated that "Ralph Bailey has an aversion to MGAs

12. Conflicting points of view were expressed by insurance experts at trial about the relative effectiveness of MGA underwriting, as filtered through semi-automatic facilities, and risk-by-risk underwriting on a "direct" basis. Defendants offered evidence that the losses sustained

under the SANS Treaties were less than those suffered by the reinsurance industry as a whole during the same period. Plaintiffs did not attempt to disprove this but rather insisted that the defendants never provided the type of reinsurance business they had promised.

and he will have to be approached rather delicately because a good deal of the business going into this facility will be on business which is designed to provide a real flow of business from a single source." This memorandum also noted that Tom Hearn, of Hodson, would travel to London on December 15, 1980 to attempt to overcome this aversion. Responding to repeated requests from Graham Watson employees, Bailey agreed at some time during the first year to begin allowing non-system business to be ceded to the Treaties. While he expressly agreed to the cession of certain MGA business during the first year (from an MGA known as the London Agency), he did so only with great reluctance. However, he did not request or insert an exclusion for MGA business in the slips or Treaty Wordings for subsequent years, as he could have done. No such express exclusion was ever inserted.

### 4. Renewal of the Treaties

The SANS Treaties were continuous contracts subject to cancellation "upon 120 days prior written notice at December 31, 1980 or any subsequent December 31st." This allowed any desired adjustments to be made in the terms of the Treaties on a yearly basis. In practice, all of the retrocessionaires cancelled during the 120–day period preceding December 31, 1980 and then initialled new slips for the next calendar year. In order to induce renewal, Graham Watson, again through Hodson and the European sub-brokers, disseminated a document referred to as the 1981 Anniversary Information. In addition to listing losses in excess of $50,000 reported through September 30, 1980, and providing a summary of the business ceded thus far, the Anniversary Information included the following statements:

> To date, the preponderance of the business has been assumed from First State Insurance Company and written on a pro rata basis. Non–System business represents a relatively small proportion of the total and what has been written is limited to Casualty business on an excess of loss basis ema-

nating from Baccala and Shoop Insurance Services.

Because of the competitive climate in the United States, Non–System business will develop more slowly than originally anticipated. It continues to be the posture of Graham–Watson not to seek business on a wholesale basis but rather to develop close working relationship [sic] with selected primary sources.

On March 23, 1981, a meeting was held in Boston to discuss the performance of the SANS Treaties. In attendance were Ralph Bailey and several employees of Hodson and Graham Watson. One major topic of conversation was the inclusion of MGA business. Bailey asked the Graham Watson underwriters for their opinion of Baccala & Shoop, and was told by Bob Wright, the property underwriter, that Wright knew most of Baccala & Shoop's home office people and was comfortable with them. Later in the meeting, however, Bailey stated that he would not consider any new MGA business for the facility. He did not, however, make this a contractual requirement by inserting an exclusion for MGA business in the slip at the next renewal.

At the close of the second year, a 1982 Anniversary Information was disseminated, which again provided a list of losses and a summary of the business. This document also included figures as to overall loss experience through September 30, 1981, which disclosed that the SANS Treaties were losing money. Indeed, the loss ratio for the 1980 Treaties was an alarming 248.65 percent.[13] In addition, the 1982 Anniversary Information included the following statements:

> The rating basis of these treaties is being amended with effect from 1st January 1982 to more accurately reflect the basis used by Graham–Watson. All business other than that assumed from the First State which is a "system" company is being written on a net rated basis in that Graham–Watson is quoting their price and if a ceding commission is required by the original company, this is then added to the premium required by Graham–Watson

> . . . .

13. Loss ratio is the ratio of net earned premium to incurred losses. A loss ratio under 100% indicates a profitable treaty; a loss ratio greater than 100% indicates that more money is being paid to satisfy claims than is being made in the form of premiums.

The current sources of business is [sic] as follows:—

FIRST STATE INS. CO.

TWIN CITY per Baccala and Shoop Insurance Services

ST. PAUL FIRE & MARINE

NORTHBROOK

CRUM & FORSTER

CNA

ROYAL INS. CO.

CHUBB AND SON

AETNA CASUALTY & SURETY

Plaintiffs point out defendants' failure to mention, other than in the case of Twin City, that certain of the listed primary insurers acted through Baccala & Shoop or other intermediary.

It appears that no formal anniversary information was prepared for 1983, the last year of the SANS Treaties, although letters were sent to the retrocessionaires containing a list of losses, a summary of the business, and notification of various changes that had been made over the past year, none of which are material here. However, the retrocessionaires were told that the treaties were "continuing for 1983 basically as before."

Following the placing of the SANS Treaties, the plaintiffs at first accepted their shares of the premiums and paid their shares of corresponding losses incurred by NERCO. The losses were considerable, as they were throughout the insurance industry at this time. Beginning as early as the fourth quarter of 1982, however, certain of the plaintiffs ceased paying losses.[14] There was evidence that some of the plaintiffs (in addition to Terra Nova, through Bailey, as related above) began to inquire as early as 1982 about the use of MGAs to obtain business (rather than through the formation of direct relationships with primary insurers), and about the underwriting methods used by the defendants.

## C. The Present Lawsuit

In 1985, some of the plaintiffs retained counsel and sought to conduct a preliminary inspection of NERCO's books pursuant to a provision in the Treaty Wordings allowing a right of inspection "at all reasonable times for the purpose of obtaining information concerning this contract or the subject matter thereof." NERCO allowed a seven day preliminary inspection in the fall of 1985, but a dispute then arose between the parties concerning the conditions under which any further inspection was to be conducted.

Evidently dissatisfied with the results of this inspection, and concerned about the growing loss ratios of the SANS Treaties, a group of sixteen plaintiffs (of whom seven are no longer parties) commenced this action against NERCO on January 6, 1987. They alleged that they had a contractual right under the treaties to inspect NERCO's records, and that although they had previously conducted a seven day inspection, a further, more exhaustive evaluation was needed. They sought an order compelling a new inspection. On February 13, 1987, the parties entered a voluntary stipulation allowing, and establishing procedures for, a further inspection to be conducted by Roy T. Ward and four of his employees. On February 27, 1987, the district court entered an order allowing the inspection to continue pursuant to that stipulation.

Meanwhile, in late 1986 a second group of reinsurers that had continued to pay losses to NERCO while the parties discussed the possibility of a commutation[15] retained a reinsurance inspection firm, Palange & Associates, to inspect NERCO's books and records. The inspection was conducted in Boston in 1987. Again, disputes arose as to the scope and methods of this inspection; however, no

---

14. The district court made no findings as to when each individual plaintiff first refused to make payments on losses incurred. The plaintiffs introduced evidence which, the defendants argue, showed the last quarter in which each plaintiff made a payment to the defendants. The earliest was Kansa Reinsurance, which ostensibly made its last payment no earlier than the fourth quarter of 1982; the latest were nine plaintiffs including Uni Storebrand, Sampo, and

the seven companies bound through Aurora Underwriters, all of whom, it is argued, made their last payments no earlier than the fourth quarter of 1986.

15. A commutation is a method of terminating a reinsurer's obligation to pay future claims in return for a lump sum payment. It does not necessarily involve any claim or admission of wrongdoing by the reinsured.

court action was required to resolve these disputes, and Mr. Palange completed his inspection in the spring of 1988.

Following these inspections, on July 12, 1988, the original plaintiffs, now joined by the remainder of the present plaintiffs, moved to amend their complaint. The new complaint omitted the substantive allegations of the original complaint, and deleted the plaintiffs' request that the treaties be enforced. Instead, the plaintiffs asserted that the treaties had been induced by fraud and should be rescinded. They also asserted claims for breach of contract, violation of Mass.Gen.L. ch. 93A, § 2, and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Denying these allegations, defendants asserted the statute of limitations as a defense and counterclaimed for recovery under the challenged treaties, and for treble damages, costs and attorneys fees under Mass.Gen.L. ch. 93A, § 2.

Prior to trial the defendants moved for summary judgment on the statute of limitations issue, as well as on a variety of other grounds not important here. The district court held a hearing on the matter on January 15, 1992. In a written order dated January 16, 1992, the court denied summary judgment on the statute of limitations ground, with no explanation.

A jury-waived trial began on April 5, 1993. The statute of limitations was raised again during trial. The court delayed ruling until it could "find out what the facts were." On the twenty-second day of trial, the judge stated simply that "[i]t seems that there is no problem with Statute of Limitations." However, the court appeared to entertain the issue again two days later, accepting a deposition into evidence after defendants argued it was relevant to the statute of limitations.

■■■ The trial concluded on May 19, 1993, and the district court entered a memorandum and order on June 7, 1993. *See* 825 F.Supp. 370 (D.Mass.1993). The court held that the defendants had induced the plaintiffs to enter into the treaties by means of fraudulent misrepresentations, had breached their contracts with plaintiffs, and had engaged in unfair and deceptive trade practices in violation of Mass.Gen.L. ch. 93A. The RICO count was rejected. The court made no mention of defendants' statute of limitations defenses.[16]

By way of relief, the district court ordered rescission of the challenged reinsurance contracts and ordered defendants to repay to plaintiffs all sums plaintiffs had previously paid out on losses incurred under those contracts with credit for premiums paid to the plaintiffs, plus prejudgment interest at 12 percent. Judgment was entered for the plaintiffs in June 30, 1993 in the amount of $37,501,701.12 plus postjudgment interest and costs. Following several motions to amend this judgment, a new judgment was entered on September 21, 1993 in the amount of $38,118,940.07, which listed the amount due to each individual plaintiff, as opposed to the lump sum stated in the first judgment. The defendants' filed their notice of appeal from the fraud, contract, and ch. 93A claims on October 19, 1993; the plaintiffs' filed their notice of appeal from the adverse RICO finding on November 2, 1993. Motions relating to the plaintiffs' requests for attorney's fees and costs are still pending in the district court.

---

**16.** The district court also made no specific resolution in its judgment of defendants' counterclaims. It can be implied, however, as defendants state in their brief, that the court dismissed the counterclaims *"sub silentio."* The counterclaims sought to hold plaintiffs liable for their unperformed reinsurance obligations imposed by the treaties. While it would have been better practice for the court to have denied the counterclaims expressly, its intent to do so is apparent from its rescission of the treaties as having been induced by defendants' fraud and breached by defendants' actions. We have held, in parallel circumstances, that such elliptical judgments will be deemed to adjudicate all claims for Rule 54(b) purposes notwithstanding their failure to deal specifically with the counterclaims in question. *Joseph E. Bennett Co. v. Trio Indus., Inc.*, 306 F.2d 546, 548 (1st Cir.1962); *see* Fed.R.Civ.P. 54(b); 28 U.S.C. § 1291. By the same token, we hold that defendants, having acted reasonably by focussing their appeal on the district court's findings of liability, did not forfeit the right to seek relief under their counterclaims by not expressly appealing from the district court's unspecified dismissal of those counterclaims.

## D. **The District Court's Findings**

In its memorandum and order of June 7, 1993, the district court found that the defendants made, and the plaintiffs relied upon, "four material representations" to secure the plaintiffs' participation in the SANS Treaties. These were:

1. That Graham Watson would produce and underwrite property and casualty *facultative* reinsurance. This representation mean[t] that Graham Watson would underwrite reinsurance on an *individual,* risk-by-risk, certificate basis.

2. That Graham Watson would produce such reinsurance *directly* from system and non-system original insurers without the use of any intermediaries. This representation mean[t] that Graham Watson would be a direct writer of reinsurance from the original insurer, which reinsurance cessions would not be brokered.

3. That the Hartford Companies, along with First State, would be the "system business" original insurers. This representation mean[t] that the Hartford Insurance Group would be the source of "system business." The Hartford Insurance Group is made up of the so-called *Hartford Companies* and *First State,* an excess and surplus line carrier.

4. That Graham Watson would seek facultative reinsurance business from selected *primary* companies, rather than on a wholesale basis. This representation mean[t] that Graham Watson would assume reinsurance from selected insurance companies, not reinsurance companies or Managing General Agents, that is, from risk-bearing insurance entities.

825 F.Supp. at 376–77 (emphasis in original). The district court found that although business had been assumed from several of the Hartford Companies, including First State, Hartford Specialty Company, Nutmeg Insurance Company, and Twin City Insurance Company, all of this business with the exception of the First State business had been classified as non-system business. The court listed, as sources of non-system business, a number of primary insurance companies, but also a number of brokers and MGAs, and found that "[t]he majority of 'non-system business' emanated from Baccala and Shoop, a Managing General Agent, through the intermediary G.L. Hodson." *Id.* After a further discussion of Graham Watson's underwriting practices, the court stated:

Upon a review of the evidence, the Court finds that Graham Watson did not facultatively underwrite, that is, underwrite on an individual risk certificate basis as represented, any of the "system business" nor virtually any of the "non-system business"; Graham Watson underwrote all "system business" and virtually all "non-system business" by the "automatic" and/or "semi-automatic" method of underwriting.

The Court also finds, on the basis of the evidence, that most of the "non-system business" emanated from MGAs through the use of intermediaries and from intermediaries themselves, and was not produced from primary risk-bearing insurance entities directly. Although the plaintiff reinsurers were aware that Baccala and Shoop, an MGA, had ceded to the SANS Treaties approximately five percent of the total business during the first year, 1980, they were never apprised that, during the ensuing three years, Baccala and Shoop would cede the majority of "non-system business" and that other MGAs and intermediaries would cede, in conjunction with Baccala and Shoop, most of the "non-system business" to the SANS Treaties. "Non-system business" constituted, over the course of the SANS Treaties, approximately one-half of the total business ceded to the Treaties.

825 F.Supp. at 379 (emphasis in original).

With respect to the plaintiffs' fraud claims, the district court stated that the plaintiffs understood that the term "facultative," as used in the SANS Treaties, was being used in its "standard and traditional sense, namely, underwriting on a risk-by-risk certificate basis." It found that NERCO was aware of this understanding on the plaintiffs' part, "and was well aware that it, itself, was secretly using the term in a special sense without ever disclosing such special meaning" to the plaintiffs, and that this was therefore a knowing misrepresentation. As to the

breach of contract claims, the district court found that NERCO did not keep, and never intended to keep, its contractual promise to underwrite risks obtained directly from selected primary sources on an individual risk-by-risk certificate basis.

## II. Preliminary Matters

### A. Standard of Appellate Review

When reviewing the findings of a district court sitting without a jury, "'the court of appeals cannot undertake to decide factual issues afresh.'" *Jackson v. Harvard Univ.*, 900 F.2d 464, 466 (1st Cir.1990) (quoting *Reliance Steel Prod. Co. v. National Fire Ins. Co.*, 880 F.2d 575, 576 (1st Cir.1989)), *cert. denied*, 498 U.S. 848, 111 S.Ct. 137, 112 L.Ed.2d 104 (1990). We may set aside findings of fact by the district court, whether based on oral or documentary evidence, only if "clearly erroneous," and with due regard "to the opportunity of the trial court to judge of the credibility of witnesses." Fed.R.Civ.P. 52(a). A finding is clearly erroneous when, "'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)), *reh'g denied*, 333 U.S. 869, 68 S.Ct. 788, 92 L.Ed. 1147; *accord Brown Daltas & Assoc., Inc. v. General Accident Ins. Co. of Am.*, 48 F.3d 30, 36 (1st Cir.1995).

██ Review of legal rulings is, however, *de novo*. "[I]f the trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Inwood Lab., Inc. v. Ives Lab., Inc.*, 456 U.S. 844, 855 n. 15, 102 S.Ct. 2182, 2189 n. 15, 72 L.Ed.2d 606 (1982) (citing *United States v. Singer Mfg. Co.*, 374 U.S. 174, 194 n. 9, 83 S.Ct. 1773, 1784 n. 9, 10 L.Ed.2d 823 (1963)); *accord Cumpiano v. Banco Santander Puerto Rico*, 902 F.2d 148, 153 (1st Cir.1990). "[T]o the extent that findings of fact can be shown to have been predicated upon, or induced by, errors of law, they will be accorded

diminished respect on appeal." *Dedham Water Co., Inc. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 457 (1st Cir.1992) (citing *RCI Northeast Servs. Div. v. Boston Edison Co.*, 822 F.2d 199, 203 (1st Cir.1987)).

Application of these principles is complicated in the present case by the district court's disregard, in several key areas, of Rule 52(a)'s further injunction that, "[i]n all actions tried upon the facts without a jury . . ., the court shall find the facts specially and state separately its conclusions of law thereon." Fed.R.Civ.P. 52(a). Rule 52(a) imposes on the district court "an obligation to ensure that its *ratio decidendi* is set forth with enough clarity to enable a reviewing court reliably to perform its function." *Touch v. Master Unit Die Products, Inc.*, 43 F.3d 754, 759 (1st Cir.1995). The court made no findings and rulings whatsoever on the important statute of limitations issues discussed *infra*, nor, in general, did it make subsidiary findings resolving disputed evidence. Thus in finding that defendants had committed fraud in promising "facultative" reinsurance, the court stated that all parties understood that term to mean risk-by-risk, individual certificate underwriting, but made no attempt to distinguish or explain the great body of evidence indicating a broader meaning. Its finding that all plaintiffs relied on the Placing Information is similarly bereft of explanation as to how this could be, given the absence of proof of reliance in a number of instances.

These omissions have required us to remand for certain additional findings. Where possible, however, we have disposed of key issues or, if that was impossible, have set out a guiding legal standard for use on remand. In sum, we have endeavored to dispose of as much of the appeals as we properly can at this juncture.

### B. Choice of Law

We dispose first of certain contentions raised with regard to legal standards. Plaintiffs challenge defendants' assertion that the SANS Treaties contain an express choice of law provision providing for the application of Massachusetts law to plaintiffs' common law fraud and contract claims. In fact, Article

XVIII of the SANS Treaties merely provides that if a dispute is litigated, plaintiffs will submit to the jurisdiction of any court of competent jurisdiction in the United States, and "all matters hereunder shall be determined in accordance with the law and practice of such court." But while plaintiffs' point is well taken, they go on to concede that "[i]n this case, Massachusetts choice of law principles dictated the application of Massachusetts substantive law to plaintiffs' common law claims." Given the parties' (and the lower court's) general acceptance of Massachusetts law, albeit on different theories, and in the absence of a preferable choice, we shall apply Massachusetts law except as otherwise noted. *See Bird v. Centennial Ins. Co.*, 11 F.3d 228, 231 n. 5 (1st Cir.1993) (accepting parties' agreed choice of law where there was a "reasonable relation" between the litigation and the forum whose law had been selected).

### C. **The Burden Required to Prove Fraud**

 The defendants argue strenuously, and the district court stated, that the plaintiffs were required to prove fraud by "clear and convincing evidence." The plaintiffs respond that under applicable Massachusetts law fraud need not be shown by anything more than the ordinary preponderance of the evidence standard applicable to civil cases in general. Review of Massachusetts law indicates that the plaintiffs are right.[17]

In *Callahan v. Westinghouse Broadcasting Co., Inc.*, 372 Mass. 582, 363 N.E.2d 240 (Mass.1977), the Massachusetts Supreme Judicial Court ("SJC") commented on the burden of proof applicable to a libel action governed by *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) and *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Recognizing that the Supreme Court required "clear and convincing proof" in a libel case, the SJC nonetheless noted that,

the words "clear and convincing proof" had not been discussed in our cases [other than in the libel context] because the phrase had not been used theretofore in this Commonwealth. Indeed, because of the vagueness of an intermediate standard of proof, we have not looked with favor on the use of such a standard.

*Callahan*, 372 Mass. at 583, 363 N.E.2d at 241. We have not found any Massachusetts case stating that a "clear and convincing" standard should be applied in a common law fraud case, nor have we found any indication that the SJC has, since *Callahan*, looked with greater favor on introducing a "clear and convincing" standard of proof to cases where none otherwise exists. *See* Paul J. Liacos, *Handbook of Massachusetts Evidence* 38–39 (5th ed. 1981) (stating that the burden of proof in Massachusetts civil cases is "by a preponderance of the evidence" and listing those few issues, not including fraud, where a higher standard is required, including proof of a gift causa mortis, contents of a lost will, irregularity of official proceedings, and malice in a defamation action); *see also* 9 John Henry Wigmore, *Evidence in Trials at Common Law* § 2498 (Chadbourn rev. 1981) (noting that "clear and convincing" standard is commonly applied in cases of fraud, but failing to cite, in a comprehensive list of authorities, any Massachusetts case applying this standard). We conclude, therefore, that Massachusetts has not adopted a "clear and convincing" standard in cases of fraud.

### D. **The Duty Owed to the Reinsurers**

 The plaintiffs argue, and the district court found, that the defendants were under a duty to the plaintiffs of utmost good faith (*"uberrimae fidei"*). The defendants refer to the same standard. We agree that a reinsurer like NERCO, having obtained by treaty the power to impose significant risks and liabilities upon plaintiff retrocessionaires, owed to them the utmost good faith in its dealings under the treaties. *See generally*

---

**17.** Defendants also argue that, because the plaintiffs adopted "clear and convincing evidence" as the applicable burden of proof in the district court, and did not object when defense counsel stated their burden in those terms, it is now too late for them to contest the burden of proof.

However, while parties may stipulate to the facts (and perhaps even to the law, in different circumstances), they may not, by agreement or by some principal of acquiescence or waiver, compel courts to follow a clear and convincing standard that is contrary to the governing law.

*Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.,* 4 F.3d 1049 (2d Cir.1993).

This means that, as the district court properly recognized, defendants owed plaintiffs a duty "to exercise good faith and to disclose all material facts." In the non-marine context, however, a claim of fraud may not be founded on *innocent* misrepresentation and concealment. Thus, the district court properly required the plaintiff to prove that

> the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.

*Kennedy v. Josephthal & Co., Inc.,* 814 F.2d 798, 805 (1st Cir.1987) (quoting *Danca v. Taunton Sav. Bank,* 385 Mass. 1, 8, 429 N.E.2d 1129, 1133 (1982) (citations omitted)).

The standard for fraudulent concealment is similar:

> Except with respect to marine risks, concealment exists and avoids the policy where the insured has knowledge of a fact material to the risk which honesty, good faith, and fair dealing require that he should communicate to the insurer but which he designedly and intentionally withholds.

9 George J. Couch, *Cyclopedia of Insurance Law* § 38:2 (2nd ed. 1985) (Couch). Massachusetts' adherence to the same rule is indicated in *Century Indem. Co. v. Jameson,* 333 Mass. 503, 504–05, 131 N.E.2d 767, 769 (Mass.1956); *see also Unigard,* 4 F.3d at 1069 (holding that simple negligence in not disclosing a material fact does not constitute bad faith so as to avoid a policy of reinsurance).

## III. The Fraud Claims

We turn now to the substantive issues, and, initially, to the fraud claim which is pivotal to all the district court's findings. The district court saw two fundamental issues in the case, both of them relevant to its finding of fraud. One was "whether Graham Watson did underwrite *facultative* reinsurance" on the system and non-system business. The other was "whether Graham Watson produced 'non-system business' by establishing direct relationships with primary, risk-bearing, insurance companies."

### A. "Facultative" Underwriting

Plaintiffs argued, and the district court found, that "the parties to the contract" (including, it would seem, defendants themselves) "understood the meaning of that term ["facultative"] in its standard and traditional sense, namely, underwriting on a risk-by-risk certificate basis, the classic meaning of the term." 825 F.Supp. at 382. According to the court, "NERCO knew" that plaintiffs understood " 'facultative' in its standard and traditional sense of risk-by-risk certificate underwriting and was well aware that it, itself, was secretly using the term in a special sense without ever disclosing such special meaning to the Plaintiff reinsurers." Thus, the court concluded, the defendants' representation that the business would be underwritten on a risk-by-risk individual certificate basis was "knowingly false when made." *Id.*

### 1. No Express Misrepresentation

We hold that these findings are clearly erroneous insofar as they attribute to defendants an implicit or express representation that they would engage exclusively in classic risk-by-risk, individual certificate underwriting. The record is without evidence from which a court could find that defendants represented to plaintiffs that the facultative business underwritten by Graham Watson would be limited to individual certificate, risk-by-risk underwriting.

To be sure, as the court found, there was evidence that the overseas sub-brokers engaged to represent defendants by their broker, G.L. Hodson, understood "facultative" in the classic risk-by-risk individual certificate sense. Nigel Huntington–Whitely, the employee principally assigned to the SANS Treaty placements by defendants' sub-broker, Sedgwick–Payne, testified to having this understanding. But he indicated that it "may have just been an assumption," and could not identify the source of his understanding beyond his sense of what the term "facultative" might mean. It was not estab-

lished that the sub-brokers were told this by defendants nor that prior to the initial (1980) Treaties the sub-brokers communicated this view to plaintiffs or to defendants during negotiations.

To fill this gap, plaintiffs point to Huntington–Whitely's letter of June 24, 1981 (well over a year after the Treaties were entered into), wherein he states in passing that "Graham Watson is underwriting each risk individually." However, this statement clearly did not induce the plaintiffs to enter into the 1980 and 1981 SANS Treaties, given its timing. Moreover, it is arguable that the semiautomatic facilities, because they allowed Graham Watson's underwriters to reject individual risks, were a form of individual risk underwriting and thus not necessarily inconsistent with this statement.

Plaintiffs also point to the 1982 Anniversary Information, which states that, on nonsystem business, "Graham Watson is quoting their price and if a ceding commission is required by the original company, this is then added to the premium required by Graham Watson." Plaintiffs argue that this specifically describes individual risk negotiation. However, it could just as easily be read to refer to Graham Watson quoting a price during the initial negotiations leading to the formation of a semi-automatic facility. Thus, it is not an explicit promise to perform individual risk-by-risk certificate underwriting. Moreover, this representation, like the statement in Huntington–Whitely's letter, was made in 1981, and thus could not have fraudulently induced the plaintiffs to participate in the 1980 and 1981 SANS Treaties.

Defendants' chief executive, Graves Hewitt, testified at the trial to having told one of the lead underwriters, Bailey, in 1979, about his dissatisfaction with the method of using a separate certificate as to each risk, and his intention, in connection with the SANS Treaties, to use a single controlling facility for multiple risks, as was later done by means of the semi-automatic MFCs. Because the district court found—contrary to Hewitt's testimony—that defendants had not disclosed their intent to use semi-automatics, we must assume that it did not credit that testimony, although nowhere in its findings did the court mention and reject the testimony. We do not, in any case, rely upon Hewitt's testimony in determining that the court's fraud findings premised on the term "facultative" were erroneous.

Bailey himself did not attend the trial but was deposed and his deposition was read. He did not describe a meeting with Hewitt in 1979 nor any specific representations having been made to him prior to the execution of the Treaties on the character of the facultative underwriting. He testified generally to "understanding" that Graham Watson would assess and underwrite each risk separately, but did not refer to any conversation or occasion where any defendant so promised. Asked if he would have considered semiautomatic binding authorities to be facultative underwriting, he said that "is not what I had intended and not what I had been told from my own recollection." This was the closest he came to suggesting that he was told by someone (defendants, brokers, or others?) that facultative meant what the judge found. We think this vague testimony, which makes no reference to specific sources, falls short of supporting a finding that *defendants* expressly promised to engage in risk-by-risk underwriting only or knew that plaintiffs misunderstood their intentions in this regard.

## 2. The Intended Meaning of the Term "Facultative"

We similarly hold clearly erroneous the finding that defendants "knew" that plaintiffs understood "facultative" to be limited to risk-by-risk certificate underwriting. There is no evidence of statements or correspondence by plaintiffs or their representatives to defendants, prior to execution of the slips and treaties, informing defendants that the plaintiffs understood the meaning of facultative to be so limited.

 Of course, if the court properly could have found, on the basis of the evidence, that the term "facultative" was unambiguous, referring only to individual certificate, risk-by-risk underwriting, then defendants would be charged with knowledge of that ordinary meaning. However, as the evidence clearly showed, that term, both stand-

ing alone and as used in the Placing Information, slips, and Treaty Wordings, encompasses a variety of underwriting methods, about the propriety of which the parties and their experts disagree. Whether or not a term as used by parties to a contract is ambiguous is a question of law subject to plenary review. *ITT Corp. v. LTX Corp.*, 926 F.2d 1258, 1261 (1st Cir.1991) (citations omitted); *see also In re Navigation Technology Corp.*, 880 F.2d 1491, 1495 (1st Cir.1989) ("Contractual language is considered ambiguous where the contracting parties reasonably differ as to its meaning."). However, where a term is ambiguous, its meaning presents a question of fact, *see Commercial Union Ins. Co. v. Boston Edison Co.*, 412 Mass. 545, 557, 591 N.E.2d 165, 172 (1992) (citations omitted), a finding on which may only be reversed if clearly erroneous. Fed.R.Civ.P. 52(a).

As noted, the district court found that the parties understood the meaning of the term "facultative" in its "standard and traditional sense, namely, underwriting on a risk-by-risk certificate basis." If by this finding, and others like it, the district court meant that the term was legally unambiguous, being limited in meaning to only that one type of underwriting, it was wrong as a matter of law. Expert testimony and treatises presented by both sides support the view that the term, as used in the industry today, has been broadened beyond its classic roots, notwithstanding plaintiffs' insistence that the classic method is alone the proper one.

Most likely the court did not mean the term was unambiguous as a matter of law, but rather concluded, on the basis of all the evidence, that, as used in the present circumstances, it should be given the limited meaning ascribed.[18] Yet the district court offered no reasons why it gave the term the limited reading it did. Nor did it explain why it believed defendants "knew" that plaintiffs so restricted the term. On the latter point, it may have been influenced by testimony from

defendants' principal, Graves Hewitt, who said he had as good an understanding of the London insurance market as any American. The judge may have felt that, possessing such insight, Hewitt "knew" that, as some English witnesses testified, "facultative" would be understood to mean risk-by-risk certificate underwriting in that market. But absent evidence that Hewitt actually knew and believed this, such a leap would be pure speculation given Hewitt's own contrary testimony.

Moreover, English treatises introduced into evidence by plaintiffs indicate that, notwithstanding plaintiffs' witnesses, the reinsurance industry in England recognizes types of facultative reinsurance other than the risk-by-risk certificate variety. A leading English writer on reinsurance, Golding, describes in his authoritative treatise (introduced by plaintiffs) various types of facultative reinsurance other than the risk-by-risk certificate variety. One variation Golding describes is the so-called "cover in course of post." He states:

It will be clear that much of the labour involved in the facultative method is connected with getting the necessary initials on the slips. In modern practice this can be largely avoided by the system of what may be called giving cover "in course of post"—though the term nowadays extends to the use of telex communications as much as to the mail. The reinsured will arrange facilities with a number of reinsurers, whereby it may issue request notes by post, for one or more lines of a risk to be reinsured, as may be agreed. The reinsurers will then hold covered each up to the amount of its agreed share and remains so bound, unless and until it has signified its declinature "in course of post". As a rule a limit is fixed, within which this must be notified say 48 hours after receipt, though sometimes this is extended up to as much as a fortnight to allow for possible delays

---

**18.** "When the written agreement, as applied to the subject matter, is in any respect uncertain or equivocal in meaning, all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not of contradicting or changing its terms." *Affiliated FM Ins. Co. v. Constitution Reins. Corp.*, 416 Mass.

839, 842, 626 N.E.2d 878, 880 (1994) quoting *Keating v. Stadium Management Corp.*, 24 Mass. App.Ct. 246, 249, 508 N.E.2d 121 (1987)) (quoting *Robert Indus., Inc. v. Spence*, 362 Mass. 751, 753–54, 291 N.E.2d 407 (1973)), *review denied*, 400 Mass. 1104, 511 N.E.2d 620 (1987).

in transmission. If no declinature is made within the period, the reinsurer is bound in the ordinary way. The system does save a great deal of work, and is much favored by reinsureds accordingly. *Yet it may be emphasized that it still remains facultative reinsurance, for the reinsurer is in no way deprived of its power to decline, even though it must accept responsibility in the meantime.*

C.E. Golding, *Golding: The Law and Practice of Reinsurance* 42 (K.V. Louw ed., 5th ed. 1987) (emphasis supplied); *see also* R.L. Carter, *Reinsurance* 234–35 (2nd ed. 1983) (detailing use of bordereau to report risks bound under the "cover in course of post" method, which he also classifies as facultative).[19]

■ But even ignoring these indications that English custom and practice have gone beyond classic facultative methodology, it is the American, not the English, usage that

seems to us key. The underwriters in London and Europe contracted in the slips with defendant NERCO, an American company, for reinsurance *"classified by the Reassured* [NERCO] as Property and Casualty *Facultative* Assumed Business produced and underwritten by the Graham Watson division of Cameron & Colby, Inc." (Emphasis supplied.)[20] The facultative reinsurance NERCO was to classify covered risks in the American, not the English, market. NERCO was expressly delegated the right to "classify" the reinsurance. *See supra* note 20. In exercising that right, NERCO was, of course, held to a standard of reasonable classification. *Salem Glass Co. v. Joseph Rugo, Inc.*, 343 Mass. 103, 106, 176 N.E.2d 30, 32–33 (1961) (where a contract leaves a certain discretion or power in the hands of one party, that party is under a duty to exercise that power reasonably); *accord Johnson v. Educational Testing Serv.*, 754 F.2d 20, 26 (1st

**19.** Golding also states:

The subject of facultative reinsurance w[ould] not be complete without some reference to the form of reinsurance called a "facultative obligatory" or "open cover," which is generally regarded as belonging to the facultative section of the business and is often so treated in the books of a reinsurer.

An open cover is a reinsurance arrangement under which the reinsured may at its option cede a share of certain defined risks, which share the reinsurer is bound obligatorily to accept. Such an arrangement thus partakes partly of the nature of a facultative reinsurance and partly of a treaty. To the reinsured it is facultative because cessions are optional at its discretion.... To the reinsurer the open cover is more in the nature of a treaty. The obligation is an obligatory one and it applies not to an individual case but to all cases of a given class that may be ceded. No matter how the open cover may be regarded in a reinsurer's books, it is clear that it has none of the characteristics of a facultative reinsurance and in particular it lacks the fundamental feature, the power, inherent in a facultative reinsurer, to decline a risk if though fit.

Golding, *supra*, at 46–47. The open cover, as Golding describes it, seems somewhat similar to the automatic facility, except that under the open cover, the reinsurer lacks the ability to cancel the contract on short notice, as it may under the automatic. As the somewhat anomalous open cover is "generally regarded" as facultative, so much more might the automatic facility be so regarded, since it explicitly includes a right to reject risks by rejecting the entire facility. Automatics were, in any event, a minor part of defen-

dants' business, semi-automatics having been the predominant mode.

**20.** At footnote 7 of its opinion, the court stated that this language

was understood by the parties to the contract as providing NERCO with a limited discretion in classifying the types of reinsurance and that is this Court's interpretation on the basis of the evidence.

It is unclear precisely what the court had in mind by this statement. There was testimony that the contract language meant that NERCO had discretion to classify a particular risk as either a property or a casualty risk; there was other testimony that it was standard language which gave NERCO discretion to determine what business was facultative. The plain meaning of the language seems to us to allow NERCO reasonable, though not unlimited, discretion to decide what types of reinsurance fit within the stated classification—namely, as "Property and Casualty Facultative Assumed business...." Determining whether the business was "facultative" as well as whether it was "property" or "casualty" would all be included. *See Commercial Union Ins. Co. v. Walbrook Ins., Co., Ltd.*, 7 F.3d 1047, 1052 (1st Cir.1993) (citing *Jimenez v. Peninsular & Oriental Steam Navigation Co.*, 974 F.2d 221, 223 (1st Cir.1992); *Feinberg v. Insurance Co. of N. Am.*, 260 F.2d 523, 527 (1st Cir.1958)) ("In construing a contract, we must give reasonable effect to all terms whenever possible."); *id.* at 1052–53 citing *Liberty Mut. Ins. Co. v. Gibbs*, 773 F.2d 15, 17 (1st Cir.1985) (where unambiguous, contract terms must be given their plain meaning)).

Cir.1985), *cert. denied,* 472 U.S. 1029, 105 S.Ct. 3504, 87 L.Ed.2d 635 (1985). Nonetheless, being an American company operating here, NERCO would obviously be expected to classify its business pursuant to American, not English, terminology. Hence, to the extent there is any difference between the prevailing English and American views of what kind of underwriting the market regards as "facultative," the parties would have intended the American interpretation to control, absent evidence of some contrary intent. *Cf. Hazard's Adm'r. v. New England Marine Ins. Co.,* 33 U.S. 557, 564, 8 L.Ed. 1043 (1834) ("Underwriters are presumed to know the usages and customs of all of the places from or to which they make insurances.").

To be sure, plaintiffs' experts gave testimony tending to show that the American market understood the term "facultative reinsurance" to mean risk-by-risk certificate underwriting. One might argue that the district judge was entitled to believe plaintiffs' experts over defendants' (who testified to the opposite understanding),[21] and to infer that the ordinary meaning of the term "facultative" was, therefore, the traditional one of risk-by-risk certificate underwriting.

But the evidence that the term "facultative," within the American market, embraces more than just the individual risk certificate method is simply too extensive for the court to have rejected. Normally, of course, we are bound by the district court's choice among competing experts. But it is hard to gainsay experts such as defendants' expert James Inzerillo, *see supra* note 21, when even plaintiffs' experts did not categorically deny the widespread use, within the faculta-

tive operations of American reinsurers, of facilities like the semi-automatics and automatics here in issue. Plaintiffs' experts did not, in fact, testify that the ordinary meaning of the term in the American reinsurance industry was limited to individual certificate risk-by-risk underwriting. Rather they intimated that this was what, in their own opinion, the term properly meant or should mean. Yet, the question is not the abstract use of language but whether NERCO—having discretion under the slips and Treaty Wordings—could reasonably classify the semi-automatic and other methods it used in its own operations as "facultative" and whether it committed fraud when it did so.

The best approach to answering this question lies in the realities of industry practice. *Cf. Affiliated FM Ins.,* 416 Mass. at 845, 626 N.E.2d at 881 ("Where, as here, the contract language is ambiguous, evidence of trade usage is admissible to determine the meaning of the agreement."). Plaintiffs' expert, Phelan, conceded that American companies commonly used facilities similar to defendants' semi-automatics and automatics within their facultative departments. He regarded this as anomalous, and pointed out practical considerations which had led to that development. But while disapproving, he admitted to the widespread use of facilities of this type within the industry under the facultative designation.[22]

American treatise writers, moreover, like the English writers from whom we have quoted, acknowledge a substantial, even predominant, modern trend towards use of facultative facilities similar to the semi-auto-

---

**21.** Defendants' experts testified that "facultative" included reinsurance underwritten by the semi-automatic and related methods. One of defendants' experts was James Inzerillo, the former president of Munich American Reinsurance Co., the United States branch of Munich Insurance Co., the largest reinsurer in the world. He testified that individual risk underwriting was "by no means" the only form of facultative reinsurance, and that MFCs and semi-automatic and automatic facilities were all forms of facultative reinsurance. Moreover, he testified that the largest direct-writing professional reinsurers in the country all used such facilities in their facultative operations. None of plaintiffs/experts categori-

cally denied the widespread use of such facilities in facultative operations.

**22.** Phelan testified, on cross-examination:

Q: Now you said in response to Mr. Ritt's question, if I understood you correctly, that the professional reinsurers in this country in their facultative departments commonly write semiautomatic and automatic facilities and call them facultative; isn't that right?
A: Yes.
Q: And you have testified, if I understand it, that there is nothing, per se, wrong with doing so; isn't that right?
A: That is correct.

matics here in question.[23] We think it is substantially beyond cavil that, in recent times, the term "facultative reinsurance" includes methods, in addition to traditional risk-by-risk certificate underwriting, similar in concept to the semi-automatics.

Given this body of evidence, including plaintiffs' expert's concession as to the classification, we see no adequate basis, from the term "facultative" itself, for the judge to infer that defendants necessarily knew that plaintiffs would or should interpret "facultative," as used in the slips and Treaty Wordings, as limited solely to risk-by-risk certificate underwriting. While the latter is the original and classic method, *see Unigard,* 4 F.3d at 1053–54, other "streamlined" forms are clearly now being utilized within the industry under the rubric of "facultative," both here and abroad, including types in which the reinsurer can be bound on individual risks by the reinsured acting pursuant to the terms of a general authorizing contract. Such a contract requires the reinsured to report the placement of the reinsurance to the reinsurer via a bordereau; and it may give the reinsurer the right, within a specified time frame, to reject any particular risk thereafter—but not necessarily *ab initio.* The semi-automatics in issue here were designed along these lines. Facilities employing this method were developed to offset the paperwork and high costs associated with classic certificate facultative reinsurance individually negotiated in advance on a risk-by-risk basis.[24] The hallmark of facultative reinsurance—evaluation

**23.** For instance, Langler, writing in America in the 1950's, describes an arrangement very much like the MFCs used by the defendants, which he places squarely in the facultative camp. He says,

> Such facultative business as is now being done by Reinsurance Companies in the main, is transacted under Agreements somewhat similar to the enclosed. The offices ceding the business either prepare binders and/or certificates supplied by the Reinsurer or, if equipped to do so, will furnish reports of the business on an itemized bordereau, . . . . It is, however, the invariable right of the Reinsurer (or should be) to ask for the cancellation, within 5 days after receipt of advices, of any cession or cessions submitted under the terms of the agreement, otherwise the reinsurance is considered binding on both parties. It should be noted that this cancellation privilege is worthless unless itemized reports are received, from which it will be possible to review the cessions and extract one or more for cancellation notice, if desired.

William J. Langler, *The Business of Reinsurance* 103–04 (1954). Langler includes a sample contract for use with this method, which contains the following clause:

> *Cancellation Privilege.* The Reinsurer binds itself to accept reinsurances ceded to it hereunder with the understanding however that it may cancel any cession or cessions within five days after receipt of advices . . . upon notice to the *Ceding Company.*

*Id.* at 106. This clause is not dissimilar to cancellation clauses found in the MFCs used by the defendants to assume business.

The district court quoted from 2 Klaus Gerathewohl et al., *Reinsurance Principles and Practice* 1 (John Christofer La Bonte trans., 1980) in support of its view that semi-automatic and automatic facilities are not a legitimate form of facultative reinsurance. Gerathewohl does state, as a general proposition, that facultative reinsurance "always covers a single risk." However, he states, in a section entitled "The management of facultative reinsurance business," that "[i]n order to keep the direct insurer's management and administration operations for facultative reinsurance business at a minimum, it is essential to *rationalize*—ie [sic] standardize—all operational processes as far as the individual nature of facultative reinsurance will allow." *Id.* at 12 (emphasis added). Among the methods used "particularly by large professional reinsurance companies that specialize in the facultative business," *id.* at 13, is the following:

> Application of General Terms and Conditions of Facultative Reinsurance containing general principles applicable to all cessions made. Such streamlining and standardization of facultative reinsurance agreements avoids the necessity to negotiate the terms and conditions on each individual case and also excludes possible cases of doubt owing to the absence of express stipulations.

*Id.* at 14–15. Thus, Gerathewohl cannot stand as support for a definition of facultative underwriting that excludes all but individual risk-by-risk negotiation. Moreover, Gerathewohl is a German author, writing for a German reinsurance company. His views, while probably authoritative in that context, cannot be taken as authoritative over those of writers more intimate with the common practices of the American reinsurance market.

**24.** The First State reinsurance, as the district court found, fell within the automatic and/or semi-automatic method of underwriting. *See supra* section I.B.2. The record supports that finding, in the sense that the practices and understanding between First State and Graham Watson were generally analogous to those under the formalized MFCs, although the close employment settings may have indicated greater *de facto* underwriting control.

of each risk separately by the reinsurer's underwriter—is sought to be preserved by maintaining the right to cancel after the fact. Although a window of exposure is created during which the reinsurer is bound without his consent on what the latter may later decide is an unacceptable risk, the potential for damage is minimized by the relative shortness of the exposure and by contract conditions which prevent the reinsured from binding the reinsurer to predescribed types of risks the reinsurer does not wish to cover.[25]

We conclude that there is insufficient support in the record for the court's key fraud finding that defendants knowingly misrepresented to plaintiffs that they would receive one type of reinsurance (the classic risk-by-risk certificate form of facultative), while intending all along to provide another type (semi-automatic and automatic). The evidence does, indeed, support the court's finding that defendants intended to supply reinsurance underwritten by the semi-automatic and (to a minor degree) automatic methods (although not to the complete exclusion of classic facultative, a small amount of which was also produced). But the record does not support the finding that the defendants knew that the plaintiffs expected to receive only the classic risk-by-risk certificate form of facultative reinsurance, nor does it support the finding that defendants made knowing misrepresentations with respect to the term "facultative".

### 3. No Concealment

■ Before leaving this subject, we shall consider an alternate theory of fraud based on use of the term "facultative," a theory which, arguably, might enable us to uphold the district court's result.

Defendants doubtless knew that the streamlined forms of facultative underwriting they intended to provide under the SANS Treaties were not the same as the traditional form of facultative underwriting. Graves Hewitt's testimony indicated as much. He testified that most of the facultative business in his company's NERFAC division had been underwritten in the classic individual certificate manner. He wanted Graham Watson to switch to the semi-automatic method in order to get rid of the paperwork and expense associated with the classic method.[26] The record also bears the inference (assuming, as we infer, *supra*, that the court discredited Hewitt's testimony that he so informed Bailey in 1979) that defendants not only did not inform plaintiffs—or their own sub-brokers—of their intention to streamline their underwriting, but kept this information to themselves. Does it follow from this that, while negotiating the SANS Treaties, defendants designedly failed to volunteer to plaintiffs facts material to the risk—i.e., their intention to use this *type* of facultative underwriting— "which honesty, good faith and fair dealing require[d] that [they] should communicate to the insurer"? 9 Couch § 38:2.

■ Although argued by plaintiffs, the above theory was not adopted by the district court. Instead, the court found that defendants had misled plaintiffs by making the "knowingly false" representation that "reinsurance underwriting would be individu-

---

**25.** The district court found that semi-automatic underwriting differed from the classic risk-by-risk facultative method in that "the 'right to cancel' and the 'right to reject' are effective only *at the time* the right is exercised by the reinsurance underwriter and well *after* the reinsured risks had attached to the SANS Treaties." These rights were not effective *ab initio*. But this appears to be a price the industry has been willing to pay for the streamlined operation, as Golding notes, *see* Golding, *supra*, at 42 ("Yet it may be emphasized that it still remains facultative reinsurance, for the reinsurer is in no way deprived of its power to decline, *even though it must accept responsibility in the meantime*.")

**26.** Hewitt testified that when he approached Bailey in 1979, he did so intending to short circuit

the classic facultative arrangements which NERFAC was using because "we had mountains of paper to file.... I made it clear to Ralph we were not interested in doing business that way." The court, as it was entitled to, apparently rejected Hewitt's testimony. (If accepted, it would have seriously undermined any theory of intentional misrepresentation.) The testimony at least indicates that Hewitt was well aware that the MFCs and accompanying modes of underwriting were in some sense a departure from past practice. There was evidence of their occasional use by NERFAC in the past, but most of NERFAC's underwriting was by the traditional facultative method.

al risk certificate underwriting." While there is insufficient record support for such an express misrepresentation, it can be argued that defendants, being under the duty to exercise the utmost good faith, *Unigard,* 4 F.3d at 1066, were required to disclose, as a fact material to the risk, their proposed utilization of streamlined facultative underwriting procedures going beyond the traditional method.

Couch states:

> In effecting a contract of reinsurance, it is incumbent upon the original insurer to communicate to the reinsurer all facts of which it has knowledge which are material to the risk, and where it states as a fact something untrue, with intent to deceive, or where it states a fact positively as true without knowing it to be true, and which tends to mislead, the policy is avoided where such statement or fact materially affects the risk; also, any undue concealment or intentional withholding of facts material to the risk, which ought in good conscience to be communicated by the original insurer, avoids the contract, without regard to whether the knowledge or information with respect to material facts was acquired by the original insurer previously or subsequently to the writing of the original contract.

19 Couch § 80:77. While the above speaks of the relationship between original insurer and reinsurer, we think the same general principles apply between a retrocedant and retrocessionares in a reinsurance treaty. The question boils down to whether a failure to disclose plans to deviate from traditional risk-by-risk underwriting, should be considered "undue concealment or intentional withholding of facts material to the risk, which ought in good conscience to be communicated. . . ." *Id.* We answer in the negative for two reasons.

First, in determining what information is so material as to require disclosure by the insured *sua sponte,* courts recognize that the insured need not disclose "what the insurer already knows or ought to know." 9 Couch § 38:15. It is said that "[a] minute disclosure of every material circumstance is not required." *Puritan Ins. Co. v. Eagle S.S. Co., S.A.,* 779 F.2d 866, 871 (2d Cir.1985).

> Ordinarily the insured is not required to make more than a general statement of facts, and is not expected to go into the details about which the insurer manifests no interest and makes no inquiry. . . .

9 Couch § 38:58. There is a "wide distinction . . . between [the insured's duties in] those cases where there is no inquiry and those where questions are propounded by the insurer." *Id.*

Here there is no indication that plaintiffs asked defendants during the negotiation of the first SANS Treaties to describe what types of facultative underwriting they proposed to engage in. To the contrary, the executed contracts expressly allowed defendants a reasonable discretion in this regard. And as we have just held, the type of underwriting methods they utilized, while not the classic form of facultative reinsurance, fell within industry parameters.

The parties here were of equal power and highly knowledgeable. The slips and Treaty Wordings were negotiated by and between sophisticated reinsurance professionals. Without first being asked by the other party, one would not expect defendants to volunteer a plethora of details on their proposed underwriting practices. Matters would have been different had defendants affirmatively misrepresented their intended underwriting practices or given incomplete, evasive or incorrect answers to questions asked. We see no basis to infer "undue concealment" from their failure to volunteer further information about facultative underwriting characteristics where, for all that appears, the subject was not broached.

██ The slips, as said, were worded so as to vest discretion in NERCO as to the business it would classify as "facultative," indicating a willingness to leave this choice to NERCO. As previously discussed, NERCO's choice had to be reasonable and exercised in good faith. *Salem Glass,* 343 Mass. at 106, 176 N.E.2d at 32–33; *Johnson,* 754 F.2d at 26. But, within those limits, the decision was left in NERCO's hands. To say that NERCO had a duty to volunteer to plaintiffs, unasked, the nature of its proposed faculta-

tive underwriting facilities and, in effect, secure their advance approval, goes beyond the parties' bargain as written. If plaintiffs had wished to limit defendants to a particular facultative method, that requirement should have been inserted in the contract. It was not. The duty of utmost good faith should not enable a party, whose bargain later turns sour, to expand the terms of an original, fairly bargained contract.[27] Given the equal strength and sophistication of the parties, and the fact that underwriting considerations now in dispute were such obvious topics of inquiry had plaintiffs wanted to know more, we are not convinced that the record establishes that the intended methods of proposed facultative underwriting were material items of the type defendants were required, without inquiry, to disclose.

■ However, even if the materiality of the information were such that defendants should have volunteered it, the record lacks evidence from which to find that defendants, recognizing its materiality, withheld it deliberately rather than through oversight. Claims in fraud against non-marine reinsurers cannot rest on a showing of mere negligent concealment. *Unigard*, 4 F.3d at 1069. The semi-automatic and like methods employed were, as above indicated, within accepted parameters of facultative classification, and the contract left their use to defendants' discretion. Plans to use such facilities were not so abnormal as to imply fraudulent intent from the mere fact of non-disclosure. Any argument that plans to use semi-automatics had to be disclosed because that method of underwriting was especially risky

is belied by the absence of evidence linking the SANS Treaty losses with the method of underwriting used. To the contrary, defendants presented evidence which, if believed, could indicate that the losses under the Treaties were less than the industry averages for the period.[28] It is undisputed, as the judge stated, that the market in which the losses occurred was "disastrous" generally. Substantial contrary evidence was not introduced, nor was there substantial evidence of large Treaty losses from risks of a type that would likely not have been reinsured under the more deliberate classic facultative procedures. We find the record inadequate to support a finding that in failing to disclose their plans to use semi-automatic and related underwriting methods, defendants were acting with fraudulent intent.

We thus reject, as an alternative means of affirming the court's "facultative" fraud finding, the fraudulent withholding theory above discussed. We conclude that the court clearly erred to the extent it based its finding of fraud on defendants' promise to produce and underwrite "facultative" reinsurance.[29]

### B. Risks Obtained Directly from Primary Insurers

■ The district court's fraud determination rests also on findings of misrepresentations in the 1979 Placing Information concerning Graham Watson's intent to obtain reinsurance directly from selected primary insurers without intermediaries. The court found that (1) NERCO represented that it would "produce 'non-system business' from primary, risk-bearing, insurance companies

27. To argue that the plaintiffs' underwriters were lulled into not asking because they did not understand the American meaning of "facultative" is surely to underestimate the acuity of the London underwriters who write insurance around the world. As already mentioned, English authorities like Golding, *supra*, indicate that, even in the British market, streamlined methods of facultative underwriting are well known. But assuming different considerations in reinsuring risks in other parts of the world, underwriters are expected to seek information as to the terms and practices in the insured's market if they are interested. *Cf. Hazard's Adm'r.*, 33 U.S. at 564 ("Underwriters are presumed to know the usages

and customs of all of the places from or to which they make insurances.").

28. *Cf. Unigard*, 4 F.3d at 1054 (noting that "in recent years, the reinsurance market has witnessed an increase in participants and a decline in profitability due to huge environmental losses").

29. For reasons set out in our discussion of the plaintiffs' contract claims, *infra*, we reject the district court's determination of fraud insofar as based on its finding that defendants did not, in fact, "produce" or "underwrite" the reinsurance, but rather improperly delegated those duties to others.

directly"; (2) that "in fact, it produced most of such business from [Managing General Agents] through intermediaries and from intermediaries themselves, and yet never disclosed these material matters to the Plaintiff reinsurers as it was required to do"; (3) that plaintiffs had put their trust and confidence in, and entered into the SANS Treaties in reliance upon, the foregoing representations (as well as upon the supposed representation of individual risk certificate underwriting, rejected above); (4) that the inducing representations to produce and underwrite reinsurance from selected primary sources, and by a direct approach rather than through intermediaries, "were knowingly false" and "were not kept by NERCO nor did NERCO intend to keep such promises."

Two complementary theories emerge from these findings. First, that defendants never intended, when in 1979 they wrote and circulated the Placing Information containing the challenged representations, to live up to them. Second, that when later, during the course of the Treaties, it became apparent that "direct" non-system business was unavailable, and defendants decided to seek non-system business through intermediaries, they did not disclose "these material matters, as [they were] required to do."

### 1. Fraud in the Inducement

█ The first theory amounts to fraud in the inducement. While the misrepresentations were of intentions as to a course of action in the future, the deliberate misstatement of present intentions can constitute fraud.

> Present intention as to a future act is a fact. It is susceptible of proof. When such intention does not exist, ... it is a misrepresentation of a material fact.... The statement of fact as to present intention of the defendant, being susceptible of actual knowledge and being a fact alleged to have been false, may be made the foundation of an action for deceit.

*Feldman v. Witmark,* 254 Mass. 480, 481–82, 150 N.E. 329 (1926), *quoted in Barrett Assoc., Inc. v. Aronson,* 346 Mass. 150, 190

N.E.2d 867, 868 (1963). It is true the Placing Information was never incorporated into the contracts (consisting of the slips and Treaty Wordings). But defendants prepared and circulated the Placing Information specifically to induce persons and entities like the plaintiffs to enter into the Treaties. Knowingly false material statements therein inducing reliance would be actionable fraud.[30]

Defendants respond that the representation in the Placing Information of an intention to "develop a close working relationship with selected primary companies" and related statements were accurate reflections of their intentions when made. In support of this, they point to evidence of their efforts after the Treaties were entered into to develop a working relationship with primary companies. They also argue that at all times they did have an ongoing direct relationship with First State. Utilizing brokers and MGAs to provide NERCO with reinsurance business was said to have occurred only after it was apparent that these earlier, sincere efforts had failed.

But the court was entitled to find otherwise, as it did. *Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511–12 (if evidence is subject to more than one reasonable interpretation, it cannot be clearly erroneous). Before the Placing Information was written, there was evidence that NERCO commonly used intermediaries. Statements by defendants' witnesses at trial and in certain of defendants' planning documents issued prior to the SANS Treaties suggest an intention to continue to do so in the Graham Watson operation. And defendants' efforts, after the Treaties were in place, to secure non-brokered business could be found to be predictably ineffectual, further suggesting a lack of intention to secure the direct business described in the Placing Information. The Placing Information representations, it might be inferred, more reflected a calculated effort to entice plaintiffs to enter into the Treaties than honestly to project defendants' real business plans. While susceptible of another construction, the record adequately supports the court's finding that representations in the

---

30. Defendants challenge the district court's finding that all plaintiffs relied on these misrepresentations. We discuss reliance in the following section.

Placing Information as to Graham Watson's direct writing intentions were knowingly misstated.

Defendants argue that even though NERCO may have used intermediaries, it nonetheless complied with its representation that it would develop a close working relationship with primary companies. Defendants point out that the reinsurance it wrote with the aid of intermediaries came, for the most part, from highly regarded primary insurance companies. They also argue that the intermediaries enabled them to develop relationships with these companies that might, in time, become "direct." But the court, as it did, was entitled to read the Placing Information as inconsistent with the securing of business through brokers and MGAs. The Placing Information says, for example, that "[f]aculative reinsurance emanating from reinsurance intermediaries will continue to be written separately through NERFAC." While defendants seek to place a different meaning on this, the court was entitled to read this as saying that business through intermediaries would not be handled by Graham Watson. And there were other statements supporting the same impression.

The court was entitled to conclude that there were significant differences between a "direct" relationship between NERCO and selected primary insurers and a relationship by brokers and MGAs. These differences could affect the quality of the business, at least in some people's minds, and might have caused some plaintiffs, had they been aware of defendants' actual plans, to reevaluate their decision to participate in the SANS Treaties. In the case of business obtained through MGAs, for instance, the MGA underwrote the risk for the primary insurer (as opposed to the underwriting being performed by the primary insurer itself); communications, premiums, and reporting and accounting documents were routed through the broker. The MGA was not at risk should an actual loss arise. Bailey, a lead underwriter, strenuously objected to business underwritten by intermediaries, regarding it as of lesser quality. The court was entitled to believe that the non-system business provided through Baccala and Shoop and others was

materially different from the business represented in the Placing Information. We, therefore, affirm the district court's finding that material and knowing misrepresentations were made in the Placing Information in 1979.

### 2. Concealment

 The court also found that NERCO "never disclosed these material matters to the Plaintiff reinsurers as it was required to do." This appears to be a finding that, while the Treaties were in effect, NERCO violated its good faith duty to disclose to plaintiffs matters coming to its attention material to the risk—most notably its growing use of intermediaries for non-system business and its abandonment of the plans set out in the Placing Information to establish direct relationships with primary insurers. *See Unigard*, 4 F.3d at 1069. This trend, however, was not totally unannounced by defendants. In the 1981 Anniversary Information, defendants revealed that, although the preponderance of that year's business was system business from First State, a "relatively small proportion of the non-system business had been written on an excess of loss basis emanating from Baccala and Shoop Insurance Services." At this time, Bailey was already well aware that NERCO was receiving the Baccala and Shoop business. He objected to it, but finally went along for that year. Because Bailey was a lead underwriter, this conceivably (although we do not decide) put all the plaintiffs for whom he was acting on notice that more such business could be anticipated in the following year, yet neither he nor anyone else took the simple precaution of inserting a prohibition against this type of business in the renewal slips for 1981 and following years.

The district court dismissed the 1981 Anniversary Information disclosure in the following finding:

> Although the Plaintiff reinsurers were aware that Baccala and Shoop, an MGA, had ceded to the SANS Treaties approximately five percent of the total business during the first year, 1980, they were never apprised that, during the ensuing three years, Baccala and Shoop would cede the

majority of "non-system business" and that other MGAs and intermediaries would cede, in conjunction with Baccala and Shoop, most of the "non-system business" to the SANS Treaties.

This finding does not explain, however, why Bailey and others, once on notice that business was being accepted that was contrary to representations in the Placing Information, did not continue to protest and try to head off the acceptance of further such business. Moreover, the court made no reference to other evidence that certain of the plaintiffs may have learned a considerable amount about the nature and source of defendant's business during the life of the SANS Treaties. Such evidence is relevant, under discovery principles, to the various statutes of limitations, including the three year fraud statute, *infra.* It may also be substantively relevant to plaintiffs' fraud claims and the recovery rights of individual plaintiffs. Although we have sustained the district court's finding that defendants deliberately misstated their business plans in 1979, if certain plaintiffs renewed their annual participations in the SANS Treaties even after becoming aware that defendants were using intermediaries and lacked "direct" business, this could affect their right to recover in fraud for subsequent Treaty business, and might conceivably cast doubt as to their right to recover at all, on some theory of acquiescence or waiver. These matters require the making of further findings as to what information became known to whom, and when, and determination of the legal effect of any such knowledge and/or notice.

■ Therefore, although we affirm the district court's finding that knowing misrepresentations were made in the Placing Information, we direct that reconsideration be given on remand to the legal significance of the information revealed in the 1981 Anniversary Information, and any other information the court finds was subsequently received by the plaintiffs, or some of them, as it relates to plaintiffs' rights to abandon their reinsurance obligations under the SANS Treaties, and recover damages for losses already paid. In considering such matters, the district court should take into account, among other things, defendants' duty of utmost good faith,

the identity of those plaintiffs affected by the particular information, the legal effect on plaintiffs of information possessed by Bailey because of his special role as a lead underwriter, and the fact that the Treaties were renewable annually. The district court did not discuss or make findings on these matters. So as to leave a clear field on remand, we vacate (without, however, necessarily disapproving) and leave for further evaluation by the district court, the court's finding that NERCO "never disclosed these material matters to the plaintiff reinsurers, as it was required to do." However, we affirm the district court's finding that the defendants' made material misrepresentations in the Placing Information regarding plans to obtain business directly from primary insurers and related matters.

On remand it will also be necessary for the court to consider exactly which of the SANS Treaties were infected by the misrepresentations made in the Placing Information. This question may be affected not only by which information came to what plaintiffs during the term of the SANS Treaties, but also by the fact that the business produced by First State was obtained directly, without the involvement of any intermediary. No part of that business, therefore, was seemingly affected by these misrepresentations although we do not foreclose the issue. In addition, because the district court made no subsidiary findings concerning the various arrangements under which Graham Watson assumed non-system business, we cannot tell whether all of that business involved the use of brokers and/or intermediaries, or whether some portion of it was obtained directly from primary insurers. On remand, the district court should take into account all such issues in determining—assuming the statutes of limitations and other matters do not stand in the way of recovery—what relief to provide.

## C. **Reliance**

■ The district court properly listed reliance as one of the elements of a common law fraud under Massachusetts law. 825 F.Supp. at 380 (stating that plaintiffs must prove that they "relied upon that representation as true and acted upon it to their detri-

ment"). The court then found that the representation that defendants would obtain business directly from primary insurers was "made by NERCO with the intention of inducing the Plaintiff reinsurers to enter into the SANS Treaties, and, *in reliance on* said ... representation[ ], the Plaintiff reinsurers did enter into the SANS Treaties to their detriment." 825 F.Supp. at 383 (emphasis supplied). The court made no subsidiary findings which would indicate what evidence it credited in finding that all of the 32 plaintiffs [31] relied.

Defendants challenge this finding, pointing out that a majority of the plaintiffs failed to present any proof whatsoever that they had individually read and relied upon the Placing Information. Underwriters for only some of the plaintiffs testified that they had relied upon the challenged statements. Plaintiffs conceded in closing argument that for many of the individual plaintiffs there was no specific proof of reliance.

■ Reliance is an element of common law fraud in Massachusetts, as the district court stated. *Danca,* 385 Mass. at 8, 429 N.E.2d at 1133 (citations omitted). It is "general insurance law" that reliance is an element of fraud in the insurance context. *E.g., Foremost Guar. Corp. v. Meritor Sav. Bank,* 910 F.2d 118, 123 (4th Cir.1990). Plaintiffs nonetheless argued below and on appeal that proof of reliance was not needed, citing *Shapiro v. American Home Assur. Co.,* 584 F.Supp. 1245 (D.Mass.1984). In *Shapiro,* the district court said that "[t]he weight of Massachusetts authority does not consider 'reliance' as a separate element which an insurer must prove in order to invalidate an insurance policy." *Id.* at 1250. But *Shapiro,* and the cases cited therein, see *Pahigian v. Manufacturers' Life Ins. Co.,* 349 Mass. 78, 206 N.E.2d 660 (1965); *Davidson v. Massachusetts Casualty Ins. Co.,* 325 Mass. 115, 89 N.E.2d 201 (1949); *Bouley v. Continental Casualty Co.,* 454 F.2d 85 (1st Cir.1972) (applying Connecticut law), are factually distinguishable from the present case. *Shapiro* and its predecessors dealt with mis-

representations made on a form application for a policy of insurance, which application was then attached to and became a part of the policy. In *Shapiro,* the application stated on its face that "any claim or action arising [from an incorrect answer to the previous question in the application] is excluded from this proposed coverage." *Shapiro,* 584 F.Supp. at 1247. The *Shapiro* line of cases relate to what have been called "warranties" in insurance law. *See* 9 Couch, § 36:1 ("Generally speaking, a warranty in the law of insurance is a statement, stipulation, or condition *which forms a part of the contract,* whereby the insured contracts as to the existence of certain facts, circumstances, or conditions, the literal truth as to which is essential to the validity of the contract.") (emphasis supplied). Warranties are typically enforced regardless of reliance. In the present case, the Placing Information was not a warranty. It was neither incorporated in, nor attached to, the contracts eventually executed, nor did the contracts themselves contain any promise that Graham Watson would obtain business directly from primary insurers. *Shapiro, Pahigian,* and *Davidson* were, in addition, all cases decided under Mass.Gen.L. ch. 175, § 186, a consumer protection statute not at issue here, and arguably inapplicable to this situation. *Cf. Liberty Mut.,* 773 F.2d at 18 (refusing to apply Mass.Gen.L. ch. 175, § 112, a consumer protection statute, in the reinsurance context, and noting that a contract of reinsurance is more "a contract of indemnity" than a policy of insurance). Finally, in *Shapiro,* the court found that even if reliance were a required element of proof under § 186, such reliance would be found on the evidence before the court. *Shapiro,* 584 F.Supp. at 1249. This obviously cannot be said here of those plaintiffs who did not present individual evidence of reliance, *infra.* Plaintiffs' counsel conceded in closing argument that what he called subjective reliance by the underwriter who wrote the risk was not proven here in many instances. We, therefore, find no basis in *Shapiro* for making an exception here to the Massachusetts requirement that a plaintiff seeking recovery

**31.** Thirty-two being the number of plaintiffs before the district court at the time it rendered judgment.

in fraud must prove reliance on the misrepresentations made.

■ As direct evidence of reliance is admittedly lacking as to many plaintiffs, the question arises whether there may be circumstantial evidence of reliance to fill in the gap. We cannot find such evidence. The plaintiffs were, for the most part, unrelated entities from several European nations. They were approached by no fewer than five sub-brokers. Defendants, it is true, concede in their brief that the SANS "placing materials were distributed by the London sub-brokers to prospective retrocessionaires, including the plaintiffs, in London and Central Europe." But delivery of the placing materials to a plaintiff is not the same as proof that the recipient looked at and relied upon them. Nor is the fact that certain other plaintiffs read and relied upon the placing materials evidence that all plaintiffs did so. Several of the plaintiffs were unable to produce copies of the Placing Information from their own files, and many were unable to present the testimony of anyone who could say that the Placing Information was seen and relied upon in making the decision to enter into the SANS Treaties. There was also evidence that, at least as to some of the plaintiffs, the sub-broker soliciting participation and the underwriter who made the decision to participate were corporate affiliates, thus raising the possibility of some motive for participation unrelated to the defendants' inducing statements.

In light of these facts, the district court's finding that all plaintiffs had relied upon the false statements in the Placing Information is legally and factually insupportable and must be vacated. We remand with directions for the district court to determine which of the plaintiffs have proven reliance in conformity with the requirements of Massachusetts law, and to deny recovery in fraud to any plaintiff who has not met this burden.

### IV. Contract Claims

We turn to the plaintiffs' contract claims.

■ (1) The slips called for the cession of "[b]usiness classified by the Reassured [NERCO] as ... Facultative Assumed business produced and underwritten by the Graham Watson division of Cameron & Colby Co., Inc." As we have held, the character of the business ceded could reasonably be classified as facultative business. We find insufficient record support for the court's finding that, "NERCO contracted under the SANS Treaties that Graham Watson would examine each individual risk submission by the ceding company on a risk-by-risk basis and, if the risk be accepted, ... would then issue an individual certificate to the ceding company." We accordingly reject, as clearly erroneous, the court's finding of breach of contract based upon the supposed non-facultative character of the reinsurance retroceded to plaintiffs.

■ (2) The district court further found that

NERCO also breached its contractual obligation to produce property and casualty facultative assumed business, for under the "automatic" and/or "semi-automatic" method of underwriting the reinsurance business is actually produced by the ceding source companies and not by the original reinsurer.

We hold this finding to be clearly erroneous. While the primary insured or its agent may indeed have the authority under the automatic or semi-automatic methods to initiate the issuance of the reinsurance, this can only be done pursuant to the reinsurer's authorization in the MFC or other advance arrangement. The reinsurance was clearly "produced" by defendants by negotiating and setting up the MFCs or other arrangements under which the business was assumed.

■ (3) The district court also found that NERCO breached its contractual representation that the business would be "underwritten" by Graham Watson. The district court found a contractual breach because, under the automatic and/or semi-automatic methods employed, "Graham Watson delegated its reinsurance underwriting authority to the source company to automatically cede risks to the SANS Treaties." The district court was undoubtedly right that under the semi-automatic and like methods, the ceding company, or the MGA representing it, was given the right initially to assign the risks to NER-

CO, and through it to plaintiffs, before review by Graham Watson's underwriters. However, this was done under facilities previously entered into with Graham Watson, containing underwriting terms and requirements satisfactory to the latter. And, in the case of most of the business, Graham Watson had the right within a stated time to reject any risk upon receipt of the bordereau or lay-off sheet disclosing it, if the risk did not meet its underwriting approval. Graham Watson was underwriting the business, albeit using the streamlined facultative methods discussed earlier in the opinion. As we have held, these methods fall within the industry's purview of "facultative underwriting." Our decision on that point dictates rejection of the district court's above finding, which rests essentially on the erroneous view that the types of facilities defendants were using were illegitimate and unacceptable underwriting vehicles. We hold, therefore, that this finding, too, was clearly erroneous.

Having said this, we remain troubled by the evidence, and the court's findings, of possible systematic inadequacies in the *quality* of the underwriting performed. Conceivably, underwriting could be so deficient as to be tantamount to a breach of the duty to underwrite. Plaintiffs insisted, with support from their experts, that Graham Watson was less than diligent in its underwriting efforts once the risks were reported to it by means of the layoff sheets and bordereau. There was evidence of delay and of inadequate underwriting data. There was also some evidence that Graham Watson's underwriters may *never* have rejected a single risk. The district court found that Graham Watson did not have "the quantity or quality of information it needed to facultatively underwrite the risks ceded to the SANS Treaties." This finding was, to be sure, based on the court's incorrectly narrow definition of facultative reinsurance, and was in support of its finding that Graham Watson did not perform facultative underwriting. Whether, under this court's very different view of the propriety of defendant's streamlined facilities, Graham Watson's "underwriting" could possibly be found to have been so inadequate as to violate its contractual duty to "underwrite" is a question we are in no position to answer.

We leave this issue to the district court, on remand, with instructions to also decide whether other considerations—such as the bar of the statute of limitations—leave it viable.

■ (4) The district court found that NERCO "violated its contractual obligation to 'co-reinsure for 10 percent participation on all "System Business" ceded hereunder,' as required by Warranty No. 2 in the Slip." Warranty No. 2 reads as follows:

2) Reassured [NERCO] co-reinsure for 10% participation on all "System Business" ceded hereunder.

The plaintiffs argue that this term was inserted into the Slips at Bailey's insistence because he wanted NERCO to keep a significant risk in the business, thus providing it with "an increased incentive to exercise care and prudence in risk selection." They then argue that in fact, NERCO did not keep a 10 percent retention, but instead obtained outside reinsurance of that 10 percent which reduced the amount of risk it kept for itself to a "minuscule" amount. In other words, they read the Warranty to require a 10 percent *unreinsured* retention. The district court appears to have also read the warranty in this manner; this is the only reasonable reading of the court's statement, as there was no evidence that NERCO did not initially retain at least 10 percent of each risk it ceded.

The defendants respond that Bailey's testimony shows that the intent of the Warranty was not that NERCO could not obtain any reinsurance of its retention, but rather that NERCO should have exposure to losses that was equal to or greater than Bailey's firm's exposure. They point out that the evidence shows that, in fact, "NERCO's actual losses on the portion of the SANS risk portfolio that it retained (unreinsured) was $105,000,000—an amount virtually equal to all of the losses of *all* of the plaintiffs combined." (Emphasis in original.)

We believe the court was entitled to view the evidence on this point as it did. There is no doubt that NERCO did reinsure some portion of its retention; Hewitt admitted as much, and the plaintiffs introduced into evi-

dence some of the reinsurance contracts used by NERCO to reinsure the retention. There was also evidence on both sides of the question whether the parties intended Warranty No. 2 to require NERCO to keep an unreinsured retention. While there are no contemporaneous documents using the phrase "unreinsured retention" or words of similar import, several witnesses, including Nigel Huntington–Whitely, who was pivotally involved in the negotiation of this point, testified that an unreinsured retention was what was intended.

The issue of what the parties intended by this language is an issue of fact, which we must uphold absent clear error. *See Commercial Union,* 412 Mass. at 557, 591 N.E.2d at 172. We, therefore, affirm the district court's finding of breach of contract on this ground, subject, of course, to any relevant findings the district court may make on remand concerning the effect of the statute of limitations and other material issues remaining open, *infra.*

## V. The Statute of Limitations

The defendants argue that "virtually" all of plaintiffs' claims should have been barred by the applicable statute of limitations defenses raised below. As already noted, we have not been able to find in the record any explanation by the district judge of his reasoning or his view of the law and the facts on these potentially dispositive issues. The possible effects of the various statutes of limitations on the different claims cannot be reviewed without findings and rulings based on the record. We, therefore, express no opinion at this time but direct the district court, upon remand, to consider the impact of the applicable statutes of limitations on the various claims, and make appropriate findings and rulings.

The parties agree that the date from which to measure the statutes of limitations is July 12, 1988, when the plaintiffs first raised their claims of fraud and breach of contract,[32] by adding these claims to their Second Amended Complaint. The applicable statute of limitations for fraud is three years, Mass.Gen.L. ch. 260, § 2A; *Tagliente v. Himmer,* 949 F.2d 1, 4 (1st Cir.1991); that for breach of contract is six years, Mass.Gen.L.Ann. ch. 260, § 2 (1992). The plaintiffs argue that each of these statutes is subject to the discovery rule, meaning that a cause of action did not accrue until the plaintiffs learned or reasonably should have learned of the factual basis for their claims. *White v. Peabody Const. Co., Inc.,* 386 Mass. 121, 129, 434 N.E.2d 1015, 1020 (1982); *see also Cambridge Plating Co., Inc. v. Napco, Inc.,* 991 F.2d 21, 26–28 (1st Cir.1993) (discussing Massachusetts discovery rule); *Tagliente,* 949 F.2d at 4 (same). If plaintiffs' claims accrued prior to July 12, 1982 (contract) or July 12, 1985 (fraud), and unless the discovery rule applies so as to delay the accrual of the alleged causes of action beyond these dates, then those claims would have been barred.

There are various facts which, if proven to the satisfaction of the factfinder, might necessitate evaluation of whether any or all of plaintiffs' fraud, and possibly other, claims were time barred. There is, for example, uncontroverted evidence that the lead underwriter, Ralph Bailey, had personal knowledge prior to 1981 of defendants' use of the MGA Baccala & Shoop. Another matter to be examined is the disclosure in the 1981 Anniversary Information, distributed to the plaintiffs in late 1980, of the fact that business had been assumed from Baccala & Shoop. There are also in the record other indications of information being conveyed to one or more plaintiffs at various times, which need evaluation to determine whether the running of the limitations periods was triggered at those moments and with what effect. For example, some of the plaintiffs stopped paying claims made by NERCO as early as the fourth quarter of 1982. The plaintiffs were obligated to make such payments by their own reciprocal duty of utmost good faith, unless, of course, they had knowledge of a *bona fide* defense to payment, such as the

---

**32.** As we say below, the district court erred in finding liability under Mass.Gen.L. ch. 93A. Therefore, we do not discuss the statute of limitations relevant to that claim. Nor, do we discuss the statute of limitations relevant to the RICO claim because we affirm the district court's finding that RICO does not apply to the facts of this case.

defendants' fraud. *See Contractors Realty Co., Inc. v. Insurance Co. of N. Am.,* 469 F.Supp. 1287, 1294 (S.D.N.Y.1979) (noting the "reciprocal duty on the part of the insurer to deal fairly, to give the assured fair notice of his obligations, and to furnish openhandedly the benefits of a policy"). Also there were letters and testimony suggesting that certain people connected with plaintiffs had knowledge as to various matters early in the 1980's.[33]

We direct the district court to evaluate all of these items, and any others it deems relevant, and to make such findings and rulings as it believes appropriate in the circumstances. We leave entirely to it, in the first instance, the determination of whether and how to apply the Massachusetts discovery rule or other relevant rule of law and how to calculate, on this record, the proper running of the applicable statutes of limitations.

## VI. The Chapter 93A Claims

In a footnote, the district court found, without more, that "the conduct of NERCO constitutes a violation of Chapter 93A, Section 2 of the General Laws of the Commonwealth of Massachusetts." 825 F.Supp. at 383 n. 9. Mass.Gen.L. ch. 93A, § 2 declares unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass.Gen.L. ch. 93A, § 11 provides for the bringing of a civil action by the victim of such practices. An action may not be brought, however, "unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." *Id.*

The defendants argued below as they do on appeal that the acts and practices said to constitute a violation of § 2 did not occur primarily and substantially within the commonwealth, as required by § 11. The district court, however, made no finding on this important point. The closest the court came

to finding where the critical conduct occurred was a statement, in the course of a colloquy with counsel, that it was "implicit ... activities had to have been found in Massachusetts." The court went on to say that while "there were activities within the state that would constitute a violation of 93A, as I found ... there are more important activities, more crucial activities that took place overseas." We are thus left without a specific finding and with considerable confusion as to what the court had in mind. Given the absence of guidance—indeed, with guidance that points in opposite directions—we must determine as best we can whether the § 11 locus requirement was met on this record.

In insisting that the acts and practices said to constitute a violation did not occur primarily and substantially within the commonwealth, the defendants assert as follows: The Placing Information was prepared by G.L. Hodson in New York. It was then transmitted to the sub-brokers in London, and communicated by the sub-brokers from London to the plaintiffs at their places of business in London and continental Europe. The plaintiffs, to the extent they relied on any misrepresentations, did so in Europe, signed the slips and Treaty Wordings in Europe, and suffered any financial injury in Europe. As the judge himself indicated, "notwithstanding that there were activities within this state, at least and maybe the most crucial were overseas." The latter reason caused the court to refuse to award double or treble damages, a discretionary matter under § 11. Defendants argue that this shows a misreading of the statute, because if the district court found that the crucial actions creating liability had occurred overseas, they could not have occurred primarily and substantially in Massachusetts, hence he should have found no liability at all under ch. 93A. Defendants insist that if misleading statements are made in Massachusetts but are received and relied

---

**33.** For example, Eric Verhes of Compagnie de Reassurance D'Ile de France apparently knew of the use of Baccala and Shoop by mid–1982; and plaintiff Imperio Re exchanged a series of letters with NERCO via the sub-broker Carter Brito E. Cunha Ltd. in late 1984 discussing the use of

Baccala and Shoop, and commented in one dated December 21, 1984 that the fact that business was "underwritten by Baccala and Shoop ... would appear to be a further point contravening the wording of the Contract."

upon outside the commonwealth, there can be no liability under ch. 93A.

The plaintiffs reply that the district court implicitly found that the defendants failed to meet their statutory burden of proving that their fraudulent conduct did not occur primarily and substantially in the commonwealth. Plaintiffs disagree that the only relevant conduct is the placing of the Treaties overseas, and argue that the relevant conduct includes (1) the location of the defendants and their business, (2) the initial drafting of the placing information in Boston, prior to its communication to G.L. Hodson, (3) the fact that all subsequent false and deceptive information emanated from Boston, (4) certain later meetings between various plaintiffs and defendants, and between defendants and their brokers, in Boston, (5) the place of performance of the contracts (Boston), (6) the day-to-day operation of the SANS program in Boston, (7) the alleged obstruction of plaintiffs' attempts to inspect NERCO's books and records in Boston, and (8) the reaping of the benefits of the fraud in Boston. They argue that Massachusetts case law does not provide a bright-line test for the "primarily and substantially" standard, but rather requires a "pragmatic, functional analysis" which must include consideration not only of where the communications, reliance, and injury took place, but also where the bulk of the more mundane activities occurred.

 A finding whether the defendant has met its statutory burden of proving that its activities and transactions did not occur primarily and substantially in Massachusetts is a matter of law, subject to plenary review. *Clinton Hosp. Ass'n v. Corson Group, Inc.,* 907 F.2d 1260, 1264 (1st Cir.1990). In *Bushkin Assoc., Inc. v. Raytheon Co.,* 393 Mass. 622, 473 N.E.2d 662 (1985) the Supreme Judicial Court determined, on facts bearing much similarity to the transmission of the fraud claims here, that the violation did not occur "primarily and substantially within the commonwealth." Ch. 93A, § 11. The plaintiff, Bushkin, a New York resident, based his ch. 93A claim on "alleged representations made during a telephone call or calls in 1975 between a Raytheon officer in Massachusetts and Bushkin in New York." *Id.* at 638, 473 N.E.2d at 672. As a result of information Bushkin disclosed to Raytheon over the phone, Raytheon learned that Beech Aircraft Corporation was a possible acquisition target. Bushkin alleged that Raytheon had promised to pay him a fee if it were successful in acquiring Beech. After telling him that it was no longer interested in Beech, Raytheon acquired it with the aid of another consultant, and denied Bushkin any compensation. *Id.* at 624–26, 473 N.E.2d at 664–65.

In finding against Bushkin, the SJC noted that the telephone calls were between the two states, the allegedly deceptive statements were made in Massachusetts but received and acted on in New York, and that any loss was incurred in New York. *Id.* Based on *Bushkin,* this court in *Clinton Hosp.* minimized the location of the dissembler at the time he makes a deceptive statement for purposes of the "primarily and substantially" analysis. "Rather," we said, "the critical factor is the locus of the recipient of the deception at the time of the reliance." *Clinton Hosp.,* 907 F.2d at 1265–66. We likewise gave weight to the situs of the loss. *Id.*

Viewing the conduct surrounding the fraudulent misrepresentations in the Placing Information points to the same result as that reached in *Bushkin.* As in that case, non-Massachusetts residents are here attempting to recover for the allegedly unfair trade practices of a corporation in Massachusetts, under a statute designed to protect against in-state frauds. As in that case, the defendant's day-to-day business activities were largely carried on in Massachusetts. As in that case, we shall assume that the allegedly deceptive acts or practices—in particular, the Placing Information—originated in Massachusetts, but the Placing Information was intended to be, and was, circulated abroad, and plaintiffs received and acted upon it there. The situs of the plaintiffs' losses was also in Europe. It follows that with respect to plaintiffs' claims of fraud in the inducement, the defendants have met their statutory burden under § 11 of proving that their fraudulent conduct did not occur primarily and substantially in Massachusetts. On this

point, we reverse the district court's ruling that defendants are liable under Mass.Gen.L. ch. 93A, § 2.

This does not, however, end the matter. In this opinion, we have sustained the district court's finding of a breach of contract stemming from defendants' violation of its contractual obligation to retain 10% of all system business ceded to the SANS Treaties. We have also left open, for further consideration on remand, a contract claim for possible failure to perform underwriting as promised. And we have left open the possibility, on remand, of a finding of fraudulent concealment of the use of intermediaries and of other conduct deviating from representations in the Placing Information, in the years following the initial Treaties. The above activities, or some of them, might conceivably support—although we take no position at this time—a finding of § 2 violations occurring primarily and substantially within Massachusetts. Accordingly, while we hold that fraud in the inducement based upon representations in the Placing Information did not occur primarily and substantially within Massachusetts, we do not at this time foreclose liability under Mass.Gen.L. ch. 93A based on different conduct of the type mentioned above. We leave such determination to the district court on remand.

## VII. The RICO Claims

 In the same footnote in which it found the defendants liable under ch. 93A, the district court found for the defendants under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968, stating that,

Title 18, United States Code, Sections 1961–1968 do not apply to the facts of this

case on the ground that the Plaintiffs have failed to establish that they suffered an "investment" injury under Section 1962(a) or an "acquisition" injury under Section 1962(b) or that the three Defendants were separate persons as required under Section 1962(c).

825 F.Supp. at 383 n. 9.[34] In No. 93–2338, the plaintiffs appeal from this ruling, arguing that the district court was wrong with respect to all three sections of RICO.

In order to recover in a civil RICO action, a plaintiff must prove both that the defendant violated one of the provisions of 18 U.S.C. § 1962 and that the plaintiff was injured "in his business or property by reason of" the defendant's violation. 18 U.S.C. § 1964(c). Thus, in proving a right to recover for a RICO violation premised upon § 1962(a), the plaintiffs had to prove that they were *harmed* by reason of NERCO's use or investment of income derived from a pattern of racketeering activity in some enterprise (here alleged to be Graham Watson) engaged in interstate or foreign commerce. 18 U.S.C. §§ 1962(a), 1964(c). This they failed to do. Even assuming that they had been defrauded through the use of the mails or international wires, *see* 18 U.S.C. § 1961(1)(B), that alone is not enough to show that they were harmed additionally by NERCO's use or investment of the proceeds of that fraud to establish or operate Graham Watson. *See, e.g., Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir.1993) ("the plaintiff must allege an injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves"). The plaintiffs have simply "repeat[ed] the crux of [their] allega-

**34.** No judgment dismissing the RICO claims was entered by the district court; the only disposition of those claims is the above-quoted language in the district court's Memorandum and Order of June 7, 1993, 825 F.Supp. 370. *See* Fed.R.Civ.P. 58 ("Every judgment shall be set forth on a separate document. A judgment is effective only when so set forth and when entered as provided in Rule 79(a)."). We proceed, however, as though the judgment for the plaintiffs issued on September 21, 1993 pursuant to that order had included language expressly dismissing the RICO claims. *See Fiore v. Washington County Community Mental Health Ctr.*, 960 F.2d 229, 236 n. 10

(1st Cir.1992) (en banc) (holding that separate document requirement is waived by filing of timely notice of appeal). "The 'separate document' rule does not defeat appellate jurisdiction where a timely appeal is filed and the parties do not suffer any prejudice from the absence of a separate document entering judgment on claims that were clearly disposed of in an earlier order." *Southworth Mach. Co., Inc. v. F/V Corey Pride*, 994 F.2d 37, 39 (1st Cir.1993) (citations omitted); *see also supra*, n. 16 (discussing failure of district court to expressly dismiss defendants' counterclaims).

tions in regard to the pattern of racketeering activity." *Id.*

■ Under § 1962(b), the plaintiffs had to show that they were harmed by reason of NERCO's acquisition or maintenance of control of an enterprise through a pattern of racketeering activity. Again, even assuming that plaintiffs proved the underlying RICO violation, they failed to prove any harm beyond that resulting from the fraud which constituted the predicate act. *See, e.g., Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.,* 941 F.2d 1220, 1231 (D.C.Cir.1991) ("plaintiffs must allege an 'acquisition' injury, analogous to the 'use or investment injury' required under § 1962(a) to show injury by reason of a § 1962(b) violation"). The plaintiffs claimed that they were harmed by their participation in the SANS treaties, not by the defendants' acquisition or control of Graham Watson.

■ As to the § 1962(c) claim, the district court stated that "the three Defendants were [not] separate persons." In fact, however, NERCO, First State, and Cameron & Colby were distinct corporate entities, with separate legal identities. The distinction between those three entities is not, however, decisive for § 1962(c) purposes. The statute requires that the *person* (i.e., the three defendants) engaged in racketeering be distinct from the *enterprise* (in this case, Graham Watson, not a defendant) whose activities he or she seeks to conduct through racketeering. *See, e.g., Miranda v. Ponce Federal Bank,* 948 F.2d 41, 44–45 (1st Cir.1991) (citing cases) ("the same entity cannot do double duty as both the RICO defendant and the RICO enterprise"). Assuming the court meant to find that NERCO, First State, and Cameron & Colby were not distinct from Graham Watson, it was clearly entitled, on the evidence presented, to make such a finding. Up until mid–1980, Graham Watson was merely an unincorporated division of Cameron & Colby. After that time, although it became a separate wholly-owned subsidiary corporation, all of its employees were in fact Cameron & Colby employees, and there is no evidence whatsoever that Graham Watson took any actions independent of its parent. *Cf. Brittingham v. Mobil Corp.,* 943 F.2d 297, 302–303 (3d Cir.1991) (noting that § 1962(c) claims may be dismissed "when the enterprise and defendant, although facially distinct, are in reality no different from each other"). We accordingly affirm the district court's dismissal of the plaintiffs' RICO claims.

## VIII. Damages

■ The district court ruled that "[i]n the circumstances of this case, it is not feasible to reasonably calculate damages on the basis of the 'benefit of the bargain' method of damages." The court accordingly (after further proceedings) entered judgment in the amount of $38,118,940.07 (which sum included prejudgment interest), plus postjudgment interest and costs. This sum was calculated to be the difference between claims paid by the plaintiff reinsurers less the premiums they received during the course of the SANS Treaties. The district court also announced in its Memorandum and Order of June 7, 1993, 825 F.Supp. 370 (but not in any separate judgment), that "the only appropriate remedy is to rescind the SANS Treaties as a matter of equity."

Defendants complain on appeal that plaintiffs should have been required to prove, and could only recover, "benefit of the bargain" damages. Defendants argue that plaintiffs in fact suffered no damage at all as "[t]he results achieved under the SANS Treaties were poor, but they were better than industry average results. . . . Plaintiffs' experts, who utilized individual certificate facultative underwriting, reluctantly admitted their own operations lost money and were closed down." In defendants' view, the losses under the SANS Treaties were due to "extremely adverse market conditions—low premiums and unprecedented loss experiences." As the judge commented, it was "a disastrous market." Defendants go on to point out that "[t]here was no evidence that brokerage-located business resulted in larger losses than business obtained 'directly.'"

The court, in its opinion excused the plaintiffs from establishing damages because, for plaintiffs to have done so,

it would have been necessary to obtain the financial records of the major direct reinsurance companies ... which financial records are confidential and not accessible to third parties.

We find no legal error in the court's decision to furnish relief for fraud based on cancelling plaintiffs' reinsurance obligations under the Treaties. When an insurer establishes that it was induced by fraud to issue policies of insurance, cancellation of the policy is a customary form of relief. *See, e.g., Century Indem.,* 333 Mass. at 504–05, 131 N.E.2d at 769. To the extent that these plaintiffs were ceded shares in reinsurance under Treaties they were induced to join, and continued to participate in, because of defendants' fraud, the district court was authorized, where otherwise appropriate, to provide the remedy of retroactively cancelling the applicable Treaties, reimbursing plaintiffs for their net losses, and absolving them from their unfulfilled reinsurance obligations thereunder.

In this opinion we have reversed the fraud finding based on the "facultative" representations, but have upheld it in respect to reliance on representations in the 1979 Placing Information regarding securing nontreaty business "directly" rather than through intermediaries. Thus a cancellation remedy for fraud may still be appropriate as to reinsurance retroceded to plaintiffs which was infected by that fraud. However, we have remanded for further consideration of whether the statutes of limitations, including that for fraud, constitute a bar to the claims of any or all plaintiffs. We have also remanded for consideration whether, at least in some cases, the original fraud was dissipated, or its duration limited to a particular year or years, by the receipt of knowledge of the falsity of the earlier representations coupled with renewal of the Treaty or other conduct indicating acquiescence or waiver. We have further remanded for consideration of whether certain of the plaintiffs are barred from relief for fraud because of their failure to establish reliance.

We accordingly vacate all relief granted by the court and remand for further findings on what relief, if any, is appropriate in light of the other findings that are made upon remand. If there are instances where recovery is appropriate for breach of contract only, rather than fraud, the court should determine the proper measure of relief, and, subject to our rulings herein, the district court shall recalculate the proper award, if any is due, on the basis of its assessment of the law and facts.

## IX. Prejudgment Interest

The defendants argue that the district court's order rescinding the SANS Treaties was a restitutionary award, not an award of damages. Thus, they say, the court's assessment of prejudgment interest at the rate of 12 percent set by Mass.Gen.L. ch. 231, §§ 6B, 6C, and 6H was erroneous, because the rate of interest set by those statutes is applicable only to awards of damages, not to rescissionary awards. They argue that the plaintiffs made an express election of remedies, choosing rescission and restitution, and thus foregoing their option to pursue the remedy of contract damages and interest on those damages. The defendants contend that prejudgment interest should have been applied at the rate of 6 percent set by Mass. Gen.L. ch. 107, § 3.

In light of the fact that we are vacating the award and remanding this case to the district court, where any judgment eventually awarded to either party may bear little resemblance to the judgment we vacate today, we decline the defendants' invitation to consider this point at length. We find it of interest, however, that § 6C has been held applicable to a recovery based on an action for money paid by mistake, *Commercial Union,* 412 Mass. at 555–56, 591 N.E.2d at 171–72, a recovery which seemingly bears more resemblance to restitution than to money damages.

## X. Conclusion

*Appeal No. 93–2339*

We sustain the district court's findings and rulings on certain matters; reverse others either as being clearly erroneous or legally incorrect; and identify still others that require the district court to make findings and rulings now absent. We, therefore, vacate in

its entirety the judgment awarding a total of $38,118,940.07 to the plaintiffs and remand with directions that the district court hold further proceedings and take such further actions as are necessary to comply with this opinion.[35] We summarize our specific dispositions as follows:

(1) We reverse as being clearly erroneous the district court's finding of fraud premised upon defendants' promise to cede "facultative" reinsurance.

(2) We sustain the court's finding that the defendants made misrepresentations in the Placing Information to the effect, *inter alia,* that they would obtain business directly from primary insurers. However, the claim of fraud based on this finding must be given further consideration on remand in light of our direction to reconsider the defendants' defense based on the statute of limitations; to revisit the reliance element and deny recovery to any plaintiff unable to satisfy its burden of proof on this point; and to reconsider the possible effects of any notice and knowledge obtained by any of the plaintiffs during the lives of the SANS Treaties and determine whether these defeat or limit the duration of any plaintiffs' continuing rights of recovery in fraud.

(3) We reverse the district court's finding of breach of contract based upon the supposed non-facultative character of the retroceded reinsurance. We also reverse the district court's finding of breach of contract based upon failure to "produce" the retroceded reinsurance. We reverse the district court's breach of contract finding based on the promise that Graham Watson would "underwrite" the retroceded reinsurance, except we leave open for the court to consider, on remand, whether the underwriting might have been so entirely inadequate as to violate that provision. We affirm the district court's finding of breach of contract based upon the violation of Warranty No. 2 in the slips, subject to further findings on the effect of the statute of limitations and any other bar to recovery.

(4) We direct the court to consider and make specific findings and rulings as to the statutes of limitations defenses and to find the dates that each of the relevant statutes began to run as to each of the plaintiffs.

(5) We direct the court to recalculate the proper amount of relief and prejudgment interest to the extent its other determinations on remand are consistent with the awarding of relief to any of the plaintiffs. We have upheld, as a remedy, the cancellation of any reinsurance infected by fraudulent representations and leave to the court on remand the determination of any other theories of relief that may become appropriate.

(6) We reverse the court's allowance of plaintiffs' claims under Mass.Gen.L. ch. 93A, § 2 insofar as they are based on fraud in the inducement. However, we remand for the district court's further consideration whether any other conduct, as mentioned in this opinion, might support a finding of liability under that statute.

*Appeal No. 93–2338*

We affirm the district court's dismissal of plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

*So ordered. Each side to bear its own costs on appeal.*

---

**35.** As a matter of consistency, we likewise vacate the court's other directives not incorporated in its judgment purporting to afford relief, such as its equitable rescission of the SANS Treaties. Such orders should be revisited on remand and reissued, modified, or not as the court determines in light of this opinion and its own findings and rulings.

APPENDIX

# Bland Payne Reinsurance
### Brokers Limited
**17 001196**

PLAINTIFFS EXHIBIT

The Graham Watson division has recently been established by Cameron & Colby after a lengthy study of the facultative reinsurance operations in North America. This project has been discussed by Cameron & Colby with the Hartford and ITT, who have given their approval and support for this project.

The purpose of the Graham Watson division is twofold:

1. To participate in the property and casualty facultative reinsurance business which is currently dominated by the direct writers.

2. To rationalise the facultative placements of both the Hartford and the First State not only from an administration point of view but also to provide the retrocessionaires with a broad cross section of facultative reinsurance emanating from these two companies.

A recent analysis conducted by a leading reinsurance executive has indicated that out of a total facultative reinsurance premium, both property and casualty ceded by U.S. companies of approximately 1.6 billion per annum, over 80% is non-brokered and placed significantly with the direct professional reinsurance market. Graham Watson is charged with the responsibility of penetrating this business, to be written in the New England Reinsurance Corporation. Facultative reinsurance emanating from reinsurance intermediaries will continue to be written separately through NERFAC.

It is not the intention that Graham Watson will seek facultative reinsurance on a wholesale basis from all and sundry but it is the intention that it shall develop a close working relationship with selected primary companies.

It is appreciated that it will take time to establish these relationships on a proper and sound basis and therefore in the meantime the majority of business will emanate from the "System" which is essentially the Hartford and First State.

DEFENDANT'S EXHIBIT
BAILEYS

The majority of this business is presently ceded to the direct writing reinsurers, and therefore the business under-written by Graham Watson will be almost entirely business which has not and would not be available to the brokered rein-surance market.

It is not intended that Graham Watson will absorb all the facultative reinsurance requirements of either the Hartford or First State. However, it is the intention that the rein-surances to be arranged will receive a sufficient cross section of this business and will develop a mutually profitable relationship between New England Reinsurance Corporation and its retrocessionaires.

It is estimated that by the end of 1980 the premium on an annualised basis will be $20M divided approximately 60% casualty and 40% property. This does not take into consider-ation any Non-System business.

The commission allowances proposed are not inconsistent with terms allowed in the facultative marketplace on subject matter business.

It should be noted that there is no profit commission on the casualty business, but on both property and casualty an allowance will be made at the end of each year on the earned premiums so that NERCO may share in the investment income.

17 001197

EXHIBIT NO. 5
8-8-86
S. GRACEY
PLAINTIFF'S EXHIBIT 2

Sedgwick Payne Limited | 686 SPL

REASSURED

PERIOD

NEW ENGLAND REINSURANCE CORPORATION

Continuous Contract commencing date... and subject to cancellation upon 120 days prior written notice at December 31, 1980 or any subsequent December 31st.

In the event of cancellation Reinsurers shall remain liable hereunder as respects business in force as of the date and time of cancellation for a period not exceeding one (1) year plus odd time.

Reinsurers shall also be liable hereunder as respects any cessions applicable to business bound prior to the receipt of the notice of cancellation but which is effective subsequent to the date and time of cancellation. However, Reinsurers shall not be liable as respects such business where the effective date is beyond sixty (60) days from the date of cancellation.

Notwithstanding the above, the Reassured at its option may disregard the run-off provision hereof by giving written notice to Reinsurers prior to the effective date of cancellation. In such event Reinsurers shall return to the Reassured the unearned premium reserve as respects cessions in force hereunder less the ceding commission provided for hereunder and Reinsurers shall not be liable for losses occurring subsequent to the date and time of cancellation.

TYPE

INTEREST

PROPERTY AND CASUALTY SURPLUS TREATY

Business classified by the Reassured as Property and Casualty Facultative Assumed business produced and underwritten by the Graham Watson division of Cameron & Colby Co., Inc.,

EXCLUSIONS: As per Schedules attached and/or to be agreed Leading Underwriter only.

TREATY DETAIL

SECTION A - PROPERTY

Five (5) lines subject to a cession limit of $5,000,000 as respects any one risk.

The Reassured's minimum net retention hereunder shall be $250,000 as respects any one risk.

P 003712

## SECTION B - CASUALTY

Five (5) lines subject to a cession limit of $5,000,000 as respects any one risk.

As respects certificates which provide for an aggregate limit of liability and which attach during the currency of this Reinsurance, it is understood and agreed that all loss or losses subject to such aggregate limit occurring thereunder shall, for the purposes of this Reinsurance, be deemed to have occurred at the inception date of each certificate period. As used herein the term "certificate period" shall mean each aggregate period of a certificate which provides for aggregate limits of liability, not to exceed one (1) year plus odd time.

The Reassured's minimum net retention hereunder shall be $250,000 as respects any one risk.

As respects both Sections A and B, the Reassured shall be the sole judge of what constitutes one risk and the net retention appropriate thereto. However the Reassured will not knowingly cede to this Contract more than $ 5,000,000 where there is an identifiable accumulation of limits which are subject to one loss arising out of the same cause.

**WARRANTIES**

1) All cessions hereunder in respect of "System Business" not to exceed 50% of original reinsurance limit.
2) Reassured co-reinsure for 10% participation on all "System Business" ceded hereunder.

**RATE**

Gross Original Rates
Written Premiums Basis

## SECTION A - PROPERTY

**COMMISSION**

1) Thirty-one and one-half percent (31 1/2%) on the net written premiums ceded hereunder as respects business assumed on a pro-rata basis. Twelve and one-half percent (12 1/2%) on the net written premiums ceded hereunder as respects business assumed on an excess of loss basis.

2) In addition, at the close of each calendar year, Reinsurers shall make to the Reassured a further allowance equal to one percent (1%) of the annual premium earned hereunder.

0 0004l3

## SECTION B - CASUALTY

1) Twenty-eight and one-half percent (28 1/2%) on the net written premiums ceded hereunder as respects business assumed on a pro-rata basis. Eleven and one-half percent (11 1/2%) on the net written premiums ceded hereunder as respects business assumed on an excess of loss basis.

2) In addition, at the close of each calendar year, Reinsurers shall make to the Reassured a further allowance equal to four percent (4%) of the annual premium earned hereunder.

**TAXES**

1% Federal Excise Tax (where applicable)

2% on gross earned premium

**BROKERAGE**

**CASH LOSS**

Upon request of the Reassured individual claim payments where the 100% reinsurance recovery is $100,000 or greater.

**ACCOUNTS AND SETTLEMENTS**

(i) Monthly Accounts, as soon as practicable after the close of each month.

(ii) Balances to be paid within sixty (60) days.

**GENERAL CONDITIONS**

As respects so-called "System Business" ceded to this Treaty, the net retention borne by a Company within the System, other than the Reassured, shall constitute compliance with the net retention requirement hereon. The reinsurance hereunder shall apply in respect of losses occurring as defined in the Reassured's certificates. LOC's as required by the Reassured for Unearned Premiums and Outstanding losses in respect of Non-Authorised Reinsurers only.

For purposes of the net retention requirement hereon as regards "System Business", quota share and excess of loss reinsurance maintained by a company within the System shall be disregarded.

For purposes of the net retention requirement hereon as regards "Non-System Business", only excess of loss reinsurances maintained by the Reassured shall be disregarded.

Errors and Omissions Clause

Insolvency Clause

G.L. Hodson & Son, Inc., Intermediary Clause (1978).

P 000724

Signed line

WORDING

INTERNAL
ARRANGEMENT

To be agreed Leading Underwriter only.

Signing slips, special agreements and acceptances
hereunder, provided Treaty Limits are not exceeded,
to be agreed by Leading Underwriter only.

Renewals of risks previously specially agreed, to be
accepted without further agreement.

PORTFOLIO TRANSFER OF UNEARNED PREMIUMS - Assumption
and return where applicable.

Agree issue separate signing slips and Contract Wordings,
if required. (Signing slips t.b.a. L/U only).

P 003713